**UNITED STATES of America**

**v.**

**SUN OIL COMPANY.**

**Civ. A. No. 10483.**

United States District Court
E. D. Pennsylvania.

July 1, 1959.

As Amended Oct. 9, 1959.

Victor R. Hansen, Asst. Atty. Gen., Fred D. Turnage, Larry L. Williams and William T. Collins, Attys. Dept. of Justice, Washington, D. C.; Harold K. Wood, U. S. Atty., Philadelphia, Pa., for plaintiff.

Henry A. Frye, Rawle & Henderson, Philip H. Strubing, Philadelphia, Pa., for defendant.

GANEY, Chief Judge.

This is an action brought by the United States to enjoin the defendant Sun Oil Company from conducting its business allegedly in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1, and § 3 of the Clayton Act, 15 U.S.C.A. § 14.

The complaint charges that for more than a quarter of a century the defendant has been unreasonably restraining interstate commerce and substantially lessening competition in a line of commerce by excluding its competitors from access to a substantial part of the market for petroleum products and automotive accessories in its marketing area. This has been and still is being accomplished, the complaint states, by defendant's inducing and coercing independent automotive service station operators to enter and operate under contracts, supplemented by agreements and understandings, having the purpose, intent and effect of requiring them to purchase petroleum products and automotive accessories exclusively from it, and to refrain from purchasing these products from its competitors. Defendant is not charged with acting in concert with any other supplier of one or more of those products; nor does the evidence adduced show that it has done so.

From the evidence presented to it, the court makes the following

Findings of Facts.

1. Defendant Sun Oil Company, hereinafter called "Sun", is a corporation organized and existing under the laws of New Jersey. It transacts and has its principal place of business at 1608 Walnut Street, Philadelphia, Pennsylvania, within the Eastern District of Pennsylvania. Sun is known to the motoring public as "Sunoco."

2. Sun is engaged in the business of producing, transporting, refining and marketing crude oil and petroleum products. It obtains and purchases crude oil in the principal oil producing fields of the United States and transports it to refineries owned by it at Marcus Hook, Pa., and at Toledo, Ohio. Among the principal petroleum products manufactured at these refineries are a single grade of gasoline, sold under the name "Blue Sunoco" (and for a time as "Sunoco Dynafuel"), motor oil sold under the trade names "Sunoco Mercury Made" (classified as a regular grade oil) and "Dynalube" (classified as a premium motor oil), and other automotive lubricants.[1] Sun transports, distributes and sells all of these products to over 6,500 independent service station operators in the Sun marketing area. It markets its petroleum products under the trade name "Sunoco." In order that its gasoline may be readily identified by the public, Sun colors it blue, and uses the color scheme of blue, white and yellow on its containers, dispensing equipment, signs and advertising matter, and service stations at which its gasoline is sold. It has adopted the symbols of the diamond superimposed upon an arrow as its identifying mark.

3. Sun also sells a full line of automotive accessories, which, with a few exceptions, it purchases or receives on consignment from other suppliers. These accessories include equipment items and replacement parts which are capable of being installed or applied on automotive vehicles at a service station without major mechanical operations, such as tires, batteries, spark plugs, oil filters, fan belts, automobile polishes, waxes, lamp bulbs, seat covers, and antifreeze preparations. For convenience they are referred to as "TBA" or "tires, batteries

---

1. It also sells and distributes furnace oils to consumers.

and accessories." The line of TBA which Sun purchases from manufacturers and distributors located in various states is also transported, distributed and sold by it in interstate commerce to more than 6,500 independent service station operators in Sun's marketing area. The manufacturers which supply Sun with TBA items do not sell their products directly to Sun dealers.

4. Some of the principal TBA products which Sun purchases for resale to its dealers include: *Kelly* tires, from Kelly-Springfield Tire Co., Cumberland, Maryland; *Sunoco* batteries, from Globe-Union Inc., Milwaukee, Wisconsin; *Fram* oil filters, from Fram Corporation, East Providence, Rhode Island; and *Champion* spark plugs, from Champion Spark Plug Company, Toledo, Ohio; *Zerone* and *Zerex* anti-freeze, from E. I. duPont deNemours & Company, Wilmington, Delaware; *Westinghouse* sealed beam lights and miniature lamps from Westinghouse Electric Corporation, Philadelphia, Pa.

5. Sun itself operates approximately only forty service stations throughout its marketing area. These stations, of course, sell Sun products exclusively and only the line of TBA sponsored by Sun. The attendants at these company-owned and operated stations, which are also used for training new Sun dealers, are employees or agents of Sun.

6. For sales purposes, Sun has divided its marketing area, involving eighteen states and the District of Columbia, into six regions, roughly as follows:

(a) *Middle Atlantic Region*—comprising eastern Pennsylvania, the larger portion of New Jersey, a small portion of New York, and all of Maryland, Virginia and the District of Columbia;

(b) *New York Region*—comprising practically all of New York, and small portions of Pennsylvania, New Jersey, Connecticut, Massachusetts and Vermont;

(c) *New England Region*—comprising the New England States excepting those portions included in the New York Region;

(d) *Central Region*—comprising western Pennsylvania, eastern Ohio, West Virginia, and a small part of western New York;

(e) *Western Region*—comprising Michigan, eastern Indiana, western Ohio and northern Kentucky; and

(f) *Southeastern Region*—composed of portions of Florida.

These regions are further subdivided into sixty-four districts and in some instances into branches within the district. The boundaries of a district do not necessarily follow state lines. Each district contains a district office, a warehouse or warehouses and distribution facilities.

7. Sun's hierarchy of sales personnel in the market area is as follows:

(a) At the top is the executive officer who is in charge of Sun's marketing organization. At present his title is vice president in charge of sales. He is assisted by a general sales manager, formerly called a coordinator of sales, who sometimes acts for the vice president in charge of sales in dealing with marketing activities;

(b) In charge of each regional office is a regional manager who is the "executive officer" of his region, and as such supervises Sun's marketing operations in that region. Assisting the regional manager is an assistant regional manager, a regional TBA manager and other sales personnel. Generally, company marketing policy is determined at meetings of regional managers and is put into effect by the regional managers in their respective regions through a chain of command from regional to district managers, to salesmen. Since 1939, the regional manager has been responsible for the execution of real estate leases with dealers. He is the final arbiter in determining whether Sun will do business with a dealer.

(c) In charge of each district is a district manager who is the executive officer

of his district. He is sometimes assisted by a motor products sales manager. Each district manager has authority to execute and terminate supply agreements with dealers but sometimes he is required to obtain the approval of the regional manager.

(d) Each district has a number of motor products salesmen who regularly call on an assigned group of dealers to sell them Sun's products and sponsored TBA and to convey to them company policy. Salesmen are selected, hired, trained and discharged by the district manager with the approval of the regional manager. These salesmen receive instructions and directions principally from their respective district managers and/or district motor products sales managers at weekly sales meetings and in individual conferences with such superiors. They assist in the selecting and contacting of new dealers and sometimes participate in the cancellation of agreements with dealers. Pursuant to instructions, they relate to dealers the quota of motor oil and TBA they should purchase. In addition to their regular salary, they receive a commission if the stations assigned to them attain a certain ratio of the purchase of oil and gasoline. Sometimes their tenure of employment has been dependent in part upon the dealers maintaining such quotas.

(e) Most of the regional offices, from time to time, also employ "Inspectors" to obtain information concerning the operation and physical condition of the stations selling Sun's products. The information sought is for the purpose of aiding Sun in determining whether the stations' sales approach their potential, and Sun's salesmen are using their best efforts to sell Sun's products and sponsored TBA.

8. The main conduits through which petroleum products and TBA are distributed and sold to the consumer are the retail service stations located at sites adjacent to heavily traveled highways.[2] Suppliers maintain the bulk of the stock required for supplying the needs of the consumer because of the space limitations at service stations. The operators of the stations render a specialized service which is essential to drivers of automotive vehicles.

9. Almost all gasoline and motor oil, and many items of TBA, are offered for sale under brand names. As a group, the consuming public has no definite knowledge of the quality of the petroleum products which it buys repeatedly in small quantities. It buys a particular branded product by reason of its preference for the brand based upon past experience, the reputation of the supplier, the honesty and good will of the dealer, or because of the convenient location of the station. Suppliers strive mightily to establish a public attachment to their individual brand. To this end Sun spends a large sum of money to advertise its products. For example, in 1954 it spent close to six million dollars on various advertising media. The name "Sunoco" is well known to the motoring public in Sun's marketing area.

10. The principal product and big attraction at most service stations is gasoline, a virtual consumer necessity. It accounts for the largest part by far of the business of both Sun and its dealers in terms of dollars. Close to 90% of the gross intake of the average dealer is accounted for by the sale of gasoline.[3] Other products, such as motor oils, lubri-

2. The term station, as used herein, includes a drive-in filling station, garage, car dealership or other retail outlet for the sale of gasoline, lubricants and, in most cases, tires, batteries and automotive accessories to the motoring public.

3. In his dissenting opinion in the Standard Stations case [Standard Oil Company of California and Standard Stations v. United States], 1949, 337 U.S. 293, 321, at page 323, 69 S.Ct. 1051, at page 1064, 93 L.Ed. 1371, Mr. Justice Jackson said: "No retailer * * * can long remain in business if he does not always, and not just intermittently, have gas to sell."

cants and TBA, although important, are secondary as far as drawing customers is concerned. For example, in 1949, Sun's sales were as follows:

| | | | |
|---|---|---|---|
| a. | Gasoline | $149,000,000 | (88.7%) |
| b. | Motor oils and lubricants | 9,500,000 | (5.3%) |
| c. | TBA | 9,750,000 | (6.0%) |

11. Gasoline, because of its highly volatile and flammable nature, is not purchased in large quantities in advance of use and stored away until needed by the average motorist, as is coal or furnace oil. Presently, the only practicable way of buying gasoline for automotive purposes is at conveniently located service stations where it may be pumped into the vehicle from the tank at the time of purchase. It would follow that the prevention of the sale of a competitive brand of gasoline at service stations—Sun and all others included—in a particular retail market area by suppliers of established brands of gasoline, would in effect amount to foreclosing the sale of the competitive brand in that area, unless the owner of the brand has the resources to purchase his own retail outlets.

12. Motor oils, lubricants and TBA are, of course, not in the same class as gasoline. They may be purchased far in advance of use at the neighborhood shop and stored away until needed. However, because the time of need cannot always be anticipated, and dirty hands and soiled clothes usually eventuate from pouring oil into a combustion engine, draining a crankcase, installing or replacing a TBA item, the motoring public prefers to purchase those products, when the need arises, at the many conveniently located service stations where immediate service accompanies the purchase of the product. Lacking such service, auto accessory, hardware or department stores are not places as suitable as the service station to purchase those products. Therefore to restrict the sale of competitive motor oils, lubricants and TBA at all service stations in a market area is, as can be readily seen, tantamount to a foreclosure of the sale of competitive products in that area.

13. Displaying a product and advertising it at service stations facilitates its sale. Hence, inconspicuous, undisplayed and non-advertised products cannot be effectively sold at such stations. Compelling the removal of signs displaying the fact that a particularly branded product is for sale at a dealer's station at least retards its sale, since motorists will not, as a rule, drive from station to station for the purpose of inquiring whether the brand of motor oil or TBA of their preference is being sold on the premises.[4]

14. The mere fact that a Sun dealer may have a few containers of motor oil not of Sun brand or several items of competitive TBA openly displayed either from left-over stock or because of token purchases to satisfy the brand preference of a few customers is not indicative in and of itself that the dealer is free to handle such products in any quantity he chooses.

15. The changing over from one brand of petroleum products to another by a dealer subjects him to an economic hardship and even to the risk of a business failure. To begin with, the major suppliers of petroleum products scrupulously respect the contractual arrangements of their competitors and will not supply a dealer with its brand of products

---

4. A competing supplier of motor oil summed it up this way: "Well, to sell Quaker State Oil at a station without putting a sign out, you simply might as well not sell oil * * * you can't stop at every station to see if they have Quaker State. By then you would run out of gas."

unless it is certain that the full term of a previous supply contract has been legally terminated. And the dealer will not always be able to obtain the brand of petroleum products of his choice for his station may not fit into the distribution plan of the supplier. Even when a new supplier is secured a time lag between the removal of Sun's dispensing equipment and signs and the installation of the new and the repainting of the station inevitably takes place. Moreover it takes time before all the motorists in the locality who have a preference for the newly installed brand of gasoline become acquainted with the fact that it is being sold at the location. And there is always the chance that the new brand of gasoline and motor oil will not attract customers as well as the former brand did. Consequently the supplier's threat of cancellation of a supply agreement is not lightly received by a dealer, and he will usually hesitate before accepting an ultimatum to discontinue an established business under the banner of a proven profitable product.

16. An "undivided" station is a station where the petroleum products or the gasoline of a single supplier are sold, in contrast to the "divided" or "split" station where the gasoline of more than one supplier is sold. An exclusive or 100% outlet is a station where the products of a single supplier are sold.

17. In the wholesale distribution of branded gasoline and related branded petroleum products and TBA, it has become the almost universal practice in the industry in Sun's marketing area for suppliers of gasoline to compete for strategically located outlets which will sell their brand of gasoline exclusively.[5] Over 99% of branded gasoline purchased by the motoring public in Sun's marketing area is done at "undivided" retail stations which are identified as being stations selling the products of its particular supplier. By contrast wholesalers and jobbers of motor oils and/or TBA seek to distribute their products to all dealers even though they sell competitive products. The market areas of Sun's competitors are not necessarily co-extensive with that of Sun's; they embrace only those dealers, of which Sun dealers are but a segment, within the profitable reach of their supplies.

18. According to a station census taken by Sun in 1954, there were only 422 undivided stations out of more than 90,-000 stations canvassed. The practice of dealing primarily with the divided stations is not restricted to the major oil companies alone. Southern States, a small cooperative, served no divided accounts in its chain of 25 outlets within Sun's marketing area. Jenney has one divided out of 497 stations; Sterling (Quaker State) served 47 divided to 487 undivided; Kendall has 61 as against 389; and Pennzol's stations numbered 13 and 507. Even new competitors seek to establish their own outlets, either by erecting new stations or by winning existing wholesale distributors or retail dealers from other suppliers.

19. Benzol Stations, Inc., with offices in Dearborn, Michigan, is the only supplier that follows the practice of selling its gasoline "Benzol" through divided stations alone in Sun's marketing area; it does not own or lease service stations. Benzol gasoline is a premium or specialty gasoline which sells at a price higher per gallon than Sunoco gasoline. In the decade preceding the trial of this action, Benzol has lost ground to its competitors. For the total number of outlets in the territory in which it is sold in and about Detroit, Michigan, dropped from 355 to 286, and a dealer selling 3,000 gallons of Benzol gasoline per month is considered a large customer of Benzol Stations, Inc. In 1955, there were twenty-four undi-

5. As Mr. Justice Jackson put it in his dissenting opinion in the Standard Stations case, 1949, 337 U.S. 293, 321 at page 323, 69 S.Ct. 1051, at page 1064, 93 L.Ed. 1371: "The retail stations, wheth- er independent or company-owned, are the instrumentalities through which competition for this ultimate market is waged."

vided stations selling Benzol gasoline side by side with Sunoco, a drop of fifty-three since 1945.[6]

20. As of 1954, in the area served by Sun there were 91,382 service station dealers involving 68 brands of gasoline.

Some of these outlets were part of chains ranging from 2 to 9,717 stations. In the group, Sun ranked fifth with 6,703 outlets. A partial list of the oil companies and their outlets at this time is as follows:

| | Oil Company | No. of Stations | No. of Sun Districts in which Stations are located |
|---|---|---|---|
| 1 | Gulf | 9,717 | 64 |
| 2 | Esso | 9,489 | 48 |
| 3 | Mobilgas | 9,173 | 34 |
| 4 | Texaco | 8,326 | 64 |
| 5 | Sunoco | 6,703 | 64 |
| 6 | American | 5,858 | 54 |
| 7 | Sinclair | 5,646 | 55 |
| 8 | Atlantic | 5,539 | 48 |
| 9 | Shell | 5,112 | 55 |
| 10 | Tidewater | 3,557 | 44 |
| 11 | Cities Service | 3,126 | 63 |
| 12 | Pure | 2,894 | 23 |
| 13 | Standard of Ohio | 2,819 | 11 |

21. Sun is not one of the dominant or leading marketers of gasoline, lubricants and TBA throughout the country. As an established competitor, it is, however, one of the nation's major marketers of such products in the market area it serves. In terms of invested capital and domestic net income among the twenty largest oil companies, Sun ranked twelfth as of the year 1954,[7] the last year for which statistics were available. In the same year its sales of branded gasoline motor fuel consumption in the United were approximately 3.48% of the total States and approximately 8.42% of the total in Sun's market area. Sun's profits, although large, have not differed substantially from those of many of its competing oil companies, and its marketing area is substantially smaller than that of many of its integrated competitors.

In addition it has not grown as rapidly as Gulf, Shell, Phillips and Skelly.

22. Sun's annual sales, in terms of dollar value, of gasoline, motor oils and lubricants, and TBA to its dealers for the years 1945 to 1948 inclusive, were:

| | |
|---|---|
| 1945 | $ 55,236,126 |
| 1946 | 89,948,046 |
| 1947 | 122,719,392 |
| 1948 | 155,780,774 |

23. The number (over 6,500) of independent service stations with which Sun has business dealings constitutes a substantial part of the market for the retail sale of petroleum products, and TBA, and the volume of Sun's sales of these products is substantial.

24. Sun depends upon fewer dealers than are used by its major competitors

6. Elmer J. Blaisdell, vice president of Benzol Stations, Inc., was the only person to appear on the witness stand at the trial of this action to complain of the difficulty or inability of a supplier of gasoline to obtain outlets already selling the gasoline of another supplier to take on an additional brand of gasoline.

7. In 1946 it ranked 15th.

to sell the same quantity of gasoline. This is so because Sun operates under the "franchise" plan of distribution whereby it does business with a dealer only if the station will not compete to an appreciable degree with another Sun dealer in the immediate adjoining area. In return for the privilege of being the sole marketer of Sun's products in what amounts to an exclusive territory, Sun expects the dealer to devote his entire efforts to selling Sun's products, or at least to give a "well-rounded performance"; that is, to sell Sunoco gasoline exclusively and a "reasonable" amount of its motor oils and sponsored TBA. The giving of an "exclusive franchise" is not expressed or implied in the written dealer agreement forms, but is one of the understandings had with the dealer at the time he enters into business relations with Sun.[8] Should the dealer refuse to operate his station according to Sun's expectations, Sun will seek to replace him with another dealer in the locality or cease to supply him with petroleum products as soon as the contractual relationship, as expressed in a supply agreement, will permit it to do so.

25. Although the total of Sun's stations may remain relatively constant over a period of time it does not mean that there are few turnovers in stations during the passing of that period of time. During a year's time, for example, Sun may lose a certain number of dealers and gain a similar number and thus end up with more or less the same total as it had at the end of the previous year. In 1954 Sun lost 326 stations and gained 143 new ones, for a net loss of 183. Not all losses of dealers are the result of direct competition, but may come about because the stations do not measure up to Sun's requirements. Over the years Sun has entered into supply agreements with more than 40,000 different dealers.

26. Sun's dealers may be classified under either of two types: "A" or "AA." The "A" dealers are those who either own their stations or lease them from some one other than Sun. While the "AA" dealers (sometimes referred to as operators or lessee dealers) are those who lease the station from Sun. Included in the latter type are the "lease and release" dealers who own their service stations but lease them to Sun which in turn releases them back to such dealers. These dealers, both "A" and "AA", are not employees or agents of Sun, but are independent contractors.

27. Before a dealer may obtain Sun's products, he must sign a standard form supply contract designated as a "Dealer's Agreement." Taking into account the wide discrepancy in bargaining power between Sun and its dealers, the provisions of the supply contract are not the result of negotiation but are determined by Sun alone and are imposed upon the dealers as a condition of their doing business with Sun.

---

8. In answer to a letter of a Sun Oil Company stockholder who complained of Sun's policy in the New York City area, the vice president of Sun wrote on July 19, 1948:

"We would like to explain * * * that it is the policy of the Sun Oil Company not to establish duplication of outlets in the various areas in which we do business. Thus the dealer who handles our products in any one location is our sole representative, and if he does not actively press the sale of our products we have no other outlet to supplement his efforts. It is, therefore, essential that every one of our dealers be an enthusiastic proponent of Sunoco policies and products.

"We believe that in offering to a dealer a franchise to be the sole marketer of our products in a limited market area gives him the opportunity to wholeheartedly develop business for our products, without the fear that he is building up patronage for Sunoco products that may drift to another Sunoco dealer across the street."

Almost identical explanations were given by Sun to the Secretary of the Marketing Committee in a letter dated April 1, 1935, and to the Department of Justice in a communication dated September 24, 1941. (Exhibits G–289 and G–225, respectively.)

28. The pertinent provisions of the supply agreement ("Dealer's Agreement") are as follows:

(a) The duration of the agreement runs for a certain term, usually for one year, and then from year to year unless either party shall give the other sixty days' written notice of termination prior to the expiration of the initial term or yearly extension thereof;

(b) Sun agrees to loan the dealer the necessary equipment for the purpose of storing, advertising and dispensing Sunoco products;

(c) All equipment and signs loaned to the dealer by Sun are to remain the property of Sun. The dealer is to use such equipment only for the purpose of storing, advertising, selling and dispensing Sunoco products. Any equipment of the dealer not loaned by Sun and used by him during the term of the agreement for the storage, selling and dispensing of Sunoco products, is to be labeled and identified by the dealer with the appropriate trademark or trade name of Sun's products and decorated in the manner and colors adopted by Sun; and when the use of such equipment is discontinued, the dealer is to remove Sun's trademark or trade name and to redecorate the equipment with colors other than those used by Sun;

(d) The dealer is to operate under his own name all business conducted upon the premises, and is to display prominently at all times the name of the dealer. As proprietor and operator of the business, the dealer agrees not to represent in any manner his business as an agency of Sun, or that the dealer is an agent of Sun;

(e) During each calendar month of the agreement the dealer will buy not less than 75% of the number of gallons of Sunoco gasoline delivered by Sun to the premises during the corresponding calendar month of the preceding calendar year, and Sun in turn is not obligated to sell more than 125% of the number of gallons of gasoline delivered by it to the premises during the same period;

(f) During each month the dealer is to buy from Sun and Sun is obligated to sell to the dealer at least one gallon of motor oil for every sixty-five gallons of Sunoco gasoline, based upon the minimum set forth in paragraph (e) above. For the purpose of determining whether the ratio has been attained, eight pounds of lubricants is considered the equivalent of one gallon of motor oil;

(g) In those areas wherein Sun utilizes its Fair Trade Agreements, the dealer is not to sell Sunoco motor fuel except at prices stipulated by Sun;

(h) All trade-marked or branded Sunoco products purchased by the dealer or delivered to his station by Sun are to be sold by him as the respective trade-marked or branded Sunoco products, and he is prohibited from adulterating, mixing or blending such products with other substances before their delivery to the consumer. Sun has the right to enter upon the premises at any time for the purpose of inspecting any equipment used for storing or dispensing Sunoco products to test and take samples of Sunoco products offered for sale on the premises, and to make any repairs to any of Sun's equipment or signs it deems advisable;

(i) Sun has the right, upon twenty-four hours' written notice to the dealer to cancel[9] the agreement if during the term or any extension thereof, the dealer shall abandon his business, or assign the agreement without Sun's consent, or be evicted by reason of a default under any lease of the premises, or shall substitute any products for those of Sun's or shall mix, blend or adulterate any of Sun's trade-marked or branded products by or with any other substances before delivery to the consumer, or if attachment, execution or like process shall be

9. The term "cancel" does not always appear in the printed agreement. It is used in the findings as meaning termination during the contract period in contrast to the term "termination" or the refusal to renew by giving the required notice prior to the expiration of the contract period.

made or issued against the dealer; if during any two calendar months within any twelve-month period of the term of the agreement the dealer fails or refuses to purchase the minimum quantities of Sun petroleum products, or Sun fails to supply the dealer with the contractual maximum, the party not in default has a right to cancel the agreement on giving written notice to the other.

29. The supply agreements do not contain express provisions which either prohibit the dealer from buying products from Sun's competitors or require him to purchase his products exclusively from Sun; they do not provide for a price differential depending upon the exclusive handling of Sun's products; nor are there any clauses providing for penalties or liquidated damages in the event of a default. The agreement form is also silent regarding the purchase and sale of TBA, for Sun does not use, and never has used, written agreements in connection with the sale of TBA to dealers.

30. The wholesale prices for Sun's petroleum products and TBA also do not appear in the supply agreement for the cost of gasoline to the dealer is governed by Sun's official posted tankwagon or wholesale prices at its bulk plants at time and place of delivery, and the cost of motor oils, lubricants and TBA are set forth in price lists for those products. Subject only to the restraining influence of supply and demand and/or what competitors are charging for the same or similar products, these prices are set and revised by Sun according to its own discretion. With certain exceptions, prices for these products in particular geographical areas tend to be the same.

31. Oral or tacit agreements and understandings aside, if the dealer's monthly purchases of gasoline in any one calendar year remain the same as or are greater than the corresponding monthly purchase of the previous calendar year, the minimum quantity clause of the supply agreement will require him to buy 75% or less of his gasoline requirements. If on the other hand his monthly purchases of gasoline in any one year drop, the minimum quantity clause approaches a full requirement clause as the decrease approaches 25% of the corresponding monthly purchases of the previous year, and the clause goes beyond a full requirement clause if the decrease is greater than 25%.

32. Statistics reveal that sales of motor oil in ratio to gasoline increase when all stations, including car dealerships, garages and auto repair shops, which normally sell substantially more oil in relation to gasoline than service stations, are considered. But even if such sales are taken into account, the average gallon consumption ratio of motor oil and lubricants to gasoline in Sun's marketing area is less than the ratio of 1:65 (or 1.54% of the volume of gasoline) set forth in the supply agreements. And despite the fact that less oil is consumed in relation to gasoline during the fall-winter months than during the spring-summer months, the minimum monthly quantity clause requires the dealers to maintain the constant ratio of 1:65 on a monthly basis the year around without regard to seasons or the locale of the dealers. Moreover, since the ratio is made dependent upon the volume of gasoline delivered to the premises during the previous year, the minimum monthly quantity clause is or approaches a total requirement clause if the dealers present purchases of Sunoco motor oil are equal to or less than the ratio of one gallon of motor oil for every sixty-five gallons of gasoline purchased in the corresponding month of the previous year. It is difficult or almost impossible for the dealer of the average service station to attain a Sunoco ratio of 1:65 if he sells competitive motor oils in fair amounts along with Sunoco motor oils.[10]

---

10. Sun's vice president admitted that the ratio figures were designed to cover at least 75% of the dealers' needs of motor oil. He further testified that they were intended "to impose upon the dealer a responsibility for the selling of a reasonable amount of oil compared with the amount of gasoline he was supposed to

33. Each "AA" dealer must execute a lease designated as a "Real Estate Agreement." The lease relates only to the real estate, and its duration is coextensive with that of the supply agreement. It requires the dealer to make certain improvements when necessary, and, while the record discloses no exercise of the provision, and in most instances the word "none" was typed in the lease, the potential nevertheless obtained. The lease automatically terminates if the dealer should abandon the premises, become bankrupt or insolvent, or if any receivership or assignment for the benefit of his creditors be made. It gives Sun the option of cancelling the lease in the event of the non-payment of rent, or if attachment, execution or like process be issued against the dealer. It does not require exclusive dealing with Sun and no penalties are provided if the dealer chooses to handle products of Sun's competitors.

34. At the time the "AA" dealer executes the lease, he must also enter into a supply agreement with Sun. With certain omissions and slight modifications, the supply agreement is the same as that used by Sun with its "A" dealers. Prior to 1937, the supply agreement and the lease were combined in one written instrument.

35. Sun employs two types of financing arrangements, an "Improvement Lease" and a "Mutual Option Agreement", which enable "AA" dealers, through the lease and release device, to construct new stations or to improve their existing ones.

(a) *Improvement Lease.* Pursuant to this arrangement a dealer who desires to construct a modern station, but lacks ready capital for that purpose, borrows money from a local bank and secures this loan by leasing his station to Sun in return for a monthly rental sufficient to amortize the loan over a period of years and by assigning the right to receive the rent to the bank. Sun in turn will release the station to the dealer on a yearly term at a rental slightly in excess of the monthly rental Sun agreed to pay the dealer.

(b) *Mutual and Bailment Option Agreements.* Pursuant to this agreement Sun pays a substantial consideration either in money or improvements in return for an option under which Sun acquires the right to lease the station for a number of years at a previously agreed monthly rental. The dealer is also given the option to require Sun to lease the station from him for the same period at the rental. The mutual option agreement and the bailment option agreement provided that Sun shall have the right, upon giving thirty days notice, to remove the dealer and take over the operation of the station, and the dealer, likewise, has the privilege of revocation after thirty days.

36. When Sun cancels or terminates a lease and supply agreement with an "AA" dealer, it selects the new operator and prescribes the products he is permitted to purchase from the inventory of the outgoing operator. Sun will not allow him to purchase the competitive products, and the outgoing operator is left to dispose of the remaining inventory as best he can, usually at a loss.

37. As has been its practice for many years, Sun offers refunds to dealers on a progressive percentage scale based upon the quantity of Sun's motor oils, automotive lubricants and dollar volume of Sun's sponsored TBA, and also on a ratio basis on every gallon of motor oil or certain dollar volume of TBA to a certain quantity of gasoline purchased during a contractual year. For the purpose of determining the refunds on oil purchases, eight pounds of lubricants is considered the equivalent of one gallon of motor oil. The refunds are not conditioned upon exclusive dealings in Sun's products. The

---

sell." And according to Sun's calculations, in 1955 Sun dealers were contractually bound to purchase 18.1 million gallons of motor oil as against their "computed requirements" of 19.3 million gallons. Hence by Sun's own figures, its dealers were contractually obligated to purchase 93.8% of their requirement of motor oil from Sun.

ostensible purpose of allowing these refunds is to offer an inducement to the dealers to sell more of Sun's motor oils, lubricants and sponsored TBA. However, it must not be overlooked that the purpose of such refunds is to encourage the dealers to look to Sun as a central source of supply both for petroleum products and TBA.

38. Effective October 1, 1950, Sun's schedule of motor oil and lubricant prices for dealers listed:

(a) a quantity refunded for purchases of gallons of motor oils as follows:

| | | | | |
|---|---|---|---|---|
| 1 to 899 | none | | 2000 to 2499 | 3.5¢ per gal. |
| 900 to 1199 | 2.0¢ per gal. | | 2500 to 3499 | 4.0¢ " " |
| 1200 to 1499 | 2.5¢ " " | | 3500 to 4499 | 4.5¢ " " |
| 1500 to 1999 | 3.0¢ " " | | 4500 or over | 5.0¢ " " |

(b) a ratio refund of 1¢ for every gallon of motor oil if the dealer attained a purchase ratio of one gallon of motor oil for every sixty-five gallons of gasoline.

39. Effective July 5, 1949, Sun's dealer price schedule for TBA provided:

### Quantity Refund

A refund in accordance with the following rates and based on the annual total net invoiced dollar value of following merchandise purchased and paid for by Dealer while this price schedule remains in effect, shall be paid to Dealer by Company each time the Dealer's Agreement between Company and Dealer has an anniversary of its commencement.

\* \* \* \* \* \*

Refund for Contract Year Payable
at following Rates:

| | | | | |
|---|---|---|---|---|
| $1,500 to $1,999 | 1% | | $5,000 to $5,999 | 5% |
| 2,000 to 2,999 | 2% | | 6,000 to 6,999 | 6% |
| 3,000 to 3,999 | 3% | | 7,000 to 7,999 | 7% |
| 4,000 to 4,999 | 4% | | 8,000 and over | 8% |

### Ratio Refund

\* \* \* \* \* \*

Ratio per 1,000 Gallons [of Sun gasoline]   Refund

| | |
|---|---|
| $20.00 to $29.99 | 1% |
| 30.00 and over | 2% |

Because of Fair Trade or Franchise Agreements between Sun and the manufacturer, the dealer is not permitted by Sun to include certain items of TBA in computing the total amount of purchase for refund purposes. The price schedule indicates the cost price of which items the dealer may take into account in determining the dollar volume of TBA purchased for refund purposes.

40. With the exception of undivided stations in the Detroit, Michigan, area,

which sell Benzol gasoline along with Blue Sunoco, it is the policy and settled practice of Sun not to enter into supply agreements with dealers who sell a competitive brand of gasoline. And although its supply agreements do not contain provisions requiring the dealers to handle Sunoco products exclusively, the dealers do not take on a competitive brand of gasoline. None of Sun's major competitors will sell their gasoline to a dealer who has an outstanding supply agreement with Sun. If a dealer should perchance take on a competitive brand of gasoline after signing up with it, Sun will give timely notice of its desire to terminate the agreement upon the expiration of the current term, and will not renew the supply agreement, if at all, with that dealer unless he foregoes selling the competitive brand of gasoline. Therefore Sun's marketing practice with respect to gasoline does not foreclose all its competitors from selling their brand of gasoline at Sun's independent dealer stations for such competitors choose not to sell to Sun dealers.

41. It is also Sun's policy to require dealers selling Sunoco gasoline to sell Sun's motor oils, lubricants and sponsored TBA exclusively. To this end it refuses to enter into a supply agreement with a dealer unless he orally or tacitly agrees to handle only Sun's products and sponsored TBA. It does not permit the dealer to display signs of competitive products on the premises of the service station. Sun admits, at least, that about 12% of its dealers sell Sun products to the exclusion of others. However those dealers who do sell competitive motor oils, lubricants and TBA do not do so openly, but store them in inconspicuous places, in most instances hidden from view, to await final disposal. They do not stock competitive products in visably appreciable quantities.

42. A consumer demand for competitive motor oils and TBA exists in Sun's marketing area, and even though Sun widely advertises as a fact that the combined use of Sunoco gasoline and motor oil makes for better and less costly operation of an automotive vehicle, an appreciable number of motorists who have a preference for and purchase Sunoco gasoline also prefer, and even demand, competitive motor oil and items of TBA not sponsored by Sun. With some exceptions, Sun dealers are willing to stock and sell these competitive products in order to satisfy this customer preference and demand, provided they are not required to relinquish the selling of Sunoco gasoline to do so.

43. Sun has pursued and is pursuing a continuous uniform policy and course of conduct throughout its marketing area of requiring its independent dealers to handle its gasoline exclusively and to force these dealers to discontinue the advertisement, display and sale of competitive brands of motor oils and TBA as a condition to becoming and remaining Sun dealers.

44. Sun has induced and coerced its independent service station dealers to enter into written contracts supplemented by oral or tacit agreements and understandings, having the purpose, intent and effect of requiring them to purchase its petroleum products and TBA exclusively, and to refrain from selling, advertising or displaying these products at their stations.

45. As a direct result of the collective, although not collusive, policy and practices of Sun and its major competitive suppliers of gasoline, others, unless they have the capital to establish their own stations, are denied the opportunity of selling gasoline in Sun's market area, and the sale of competitive brands of gasoline has been almost completely eliminated at over 6,500 independent dealer stations selling Sunoco gasoline.

46. As a direct result of Sun's policy and practices, the sale of competitive motor oil and lubricants has been virtually eliminated, and the sale of TBA not sponsored by Sun has been substantially eliminated from over 6,500 independent dealer service stations selling Sunoco gasoline.

47. As a direct result of Sun's policy and practices, Sun dealers are being prevented from handling competitive petroleum products and TBA at their stations, and competitive suppliers are being foreclosed or prevented from selling these products to over 6,500 independent Sun dealers.

48. The effect of Sun's written contracts, supplemented by the oral or tacit agreements and understandings, with its dealers may be to substantially lessen competition in the sale of petroleum products and TBA in Sun's marketing area.

49. Unless Sun is enjoined by this Court there is a likelihood that Sun will continue its policy and practices regarding the sale of competitive petroleum products and TBA at its over 6,500 independent dealer stations.

### Sun's History.

50. From 1901, the date of its incorporation by Joseph Newton Pew, until the end of the First World War, Sun's principal business was the manufacture of asphalt, gas, oil and basic lubricating oils at refineries in Marcus Hook and Toledo. Gasoline was produced by it as a by-product of the refining process and was sold by Sun as an unbranded product to wholesale marketers.

51. After the First World War Sun tried to develop a domestic market for its motor oils, which it blended from its basic lubricating oils. However, it soon appeared to Sun that it could successfully sell its grade of oil to the motoring public only in connection with the sale of gasoline. In 1920, by which time the business of marketing gasoline and motor oil to the motoring public had become well developed, Sun entered the market and opened its first service station for the retail sale of its petroleum products in Ardmore, Pa. Although subsequent to 1920 Sun slowly increased the number of its own company-operated stations, it sought out and depended mainly upon independent divided or split dealers, whether they were curb-side or drive-in stations, to sell the greater volume of its gasoline to the motoring public. Sun continued this practice even though in the mid twenties the major suppliers began to withdraw from divided stations and gasoline was being marketed increasingly through dealers handling one brand of gasoline.

52. In 1927 Sun developed a new high grade gasoline possessing the favorable qualities of the so-called premium grades. It gave the gasoline a blue coloring so that the motoring public could distinguish it from other brands, and sold it under the name "Blue Sunoco." It had wide public acceptance. By 1928 Sunoco petroleum products were being marketed through 2,370 dealers supplied directly by Sun.

53. Effective January 1928, Sun's schedule of retail dealer's list prices for motor oils and greases in addition to permitting a discount for bulk sales, allowed a quantity refund for oil purchased during the contractual year of a supply agreement to the dealers as follows:

| | |
|---|---|
| 10 to 19 barrels | 5% |
| 20 to 49 barrels | 8% |
| 50 or more barrels | 10% |

For the years 1928 to 1936, inclusive, the only accessories purchased by Sun for resale were valve cases and caps, windshield wiper arms and blades, and grease fittings, which it sold only through its company-operated stations.

54. Like its competitors, Sun supplied petroleum products and storage and dispensing equipment to its "A" dealers pursuant to printed standard form supply agreements, and to its "AA" dealers in conformity with combined supply agreement and lease forms. Over the years Sun constantly changed and revised the provisions and conditions in the printed forms, and occasionally put out forms for the purpose of amending existing agreements. In the late twenties and early thirties, the following clauses or provisions, among others, appeared in most of the supply agreements with undivided "A" dealers:

(a) *Term clause*—a provision stating that the agreement was for a certain

duration, usually from one to three years, and thereafter from year to year unless either party should give the other thirty days' written notice, prior to the end of the term or any extension thereof of the desire to terminate the agreement;

(b) *Minimum quantity clauses*—provisions requiring the dealer to purchase a stated minimum monthly volume of gasoline at Sun's official posted tank-wagon, retail or posted price in effect at place and time of delivery, and motor oil and lubricants, with eight pounds of lubricants being considered as equivalent of one gallon of motor oil;

(c) *Restrictive competitive product clause*—a provision stating that the dealer shall not sell or use on the premises gasoline dispensing equipment or gasoline of any kind other than Sun's, except equipment located on the premises at the time of the agreement and the products handled thereon;[11]

(d) *Default clause*—an option in Sun to cancel the agreement immediately or on short notice if the dealer substituted other products for those of Sun's, or adulterated Sun's products with another substance before delivering it to the consumer, or failed to purchase the minimum monthly amounts of Sun's petroleum products set forth in the agreement, and that if either of these events occurred, Sun would be entitled to recover, *as liquidated damages*, a sum equal to one cent on each gallon of the minimum quantities of gasoline and motor oil or grease which the dealer had agreed to purchase from date of default to the end of the term of the agreement.

55. As the number of automobiles grew, competition for the motorists' fuel needs became increasingly keen. To attract the motorist, the major oil companies began to provide modern drive-in stations which were clean and fully equipped. This required a large capital outlay beyond the average dealer's financial resources. In keeping with the trend, Sun purchased or leased favorably located abutting highway properties which could be used as drive-in stations. After erecting stations on these properties, it would enter into combined lease and supply agreements, with "AA" dealers.

56. The lease and supply agreement forms, designated as "Distributor's Special Agreement-Lease", uniformly contained a provision which obligated the "AA" dealers to handle Sunoco gasoline and lubricants exclusively, and that if they should sell or store any competitive petroleum product on or within 500 feet of the leased premises, or if they failed to purchase the quantities of petroleum products stipulated in the minimum quantity provisions, or if they adulterated Sun's products or substituted other products for them Sun had the right to cancel the agreement on twenty-four hours' written notice and charge the operators liquidated damages in the amount of one cent per gallon on their prior average sales of Sun's products projected over the remaining term of the lease. The duration of the agreement was for one or more years and months with options in Sun to renew for a specific number of additional yearly periods, and was terminable thereafter only upon thirty days' written notice by either

11. In 1931 the restriction in this clause was extended to include territory within 500 feet of the premises. Subsequently it was made to cover not only existing brands of gasoline, but existing grades. However, not all of the agreements contained the restrictive clause, the reason apparently being that before the case of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, it was the prevailing view that the transportation of petroleum products from local bulk plants without crossing state boundaries by refiners of those products to dealers pursuant to supply contracts was not a part of interstate commerce. See Lipson v. Socony-Vacuum Corporation, 1 Cir., March 9, 1935, 76 F.2d 213, 218. Since the laws of some of the states in Sun's marketing area forbade such restrictions, Sun was under the impression that local law might govern the legality of supply contracts in those states.

party prior to the end of the initial term or any extension thereof.

57. Some of the "AA" dealers owned their stations and leased them to Sun which in turn leased them back to the dealers. These lease and re-lease arrangements were used by Sun, in part at least, for the purposes of controlling favorably located outlets over a period of years and preventing their being acquired by competitors. Sun also entered into supply agreements with "select" undivided "A" dealers which expressly required them to sell Sunoco products, or at least Sunoco gasoline, exclusively. This type of "A" dealer and the "AA" dealers, because of the exclusive dealings and other restrictive provisions in their written agreements, were sometimes referred to by Sun as "controlled accounts."

58. In 1930, Sun's gasoline sales to Sun dealers amounted to 276,354,071 gallons or 3.69% of the total gasoline consumption in Sun's marketing area, and its sales of motor oil and lubricants to such dealers were equivalent to 5,183,543 gallons, or a ratio of one gallon of motor oil to 53 gallons of gasoline.

59. By 1931, in conformity with the prevailing practice of the major suppliers of petroleum products, Sun adopted the policy of deterring the further growth of divided stations which sold Sunoco products, or of endeavoring to convert them to undivided Sun stations.

60. As an inducement to divided independent "A" dealers to sell Sunoco gasoline exclusively, Sun sold its gasoline ½ cent cheaper pursuant to its official posted prices to those dealers who sold such gasoline exclusively. Sometimes this ½ cent differential was expressly provided for in the agreement. The practice of granting a ½ cent differential to undivided stations was commonplace in the industry in Sun's marketing area at the time. Since the dealer often operated on a small margin of profit, sometimes as low as 2 to 3 cents per gallon, this price differential, although small, was a sufficient economic inducement to prevail upon some dealers to sell one brand of gasoline exclusively. Nevertheless many dealers found it more profitable to continue as divided stations, and even though the divided dealer was selling more Sunoco gasoline than an undivided dealer, he was still required to pay ½ cent more per gallon than the latter.

61. Occasionally, Sun would enter into an agreement with a divided "A" dealer who expressedly agreed to terminate any and all supply agreements with suppliers other than Sun at the earliest time permitted. However, such dealer was not permitted to receive the benefit of the ½ cent differential until all the competitive supply agreements had been terminated, and Sun retained the right to cancel the agreement if the dealer failed to terminate the supply agreements with the other suppliers at the time he agreed to do so.

62. In 1931 Sun marketed for the first time a "regular" grade of motor oil under the brand name "Sunoco Mercury-Made." This oil, although possessing peculiarly low carbon-deposit characteristics, did not have long wear qualities, especially under strenuous conditions. Since it was consumed more quickly than the so-called "premium" grade and Pennsylvania oils, it did not compete very well in the market with those oils. For this reason many dealers who sold Sunoco gasoline relied upon some of the higher priced brands of premium motor oils, and the Pennsylvania grade oils, such as Quaker State, Pennzoil, Kendall, Wolf's Head and Valvoline, in addition to "Sunoco Mecury-Made" brand to satisfy their customers.

63. Effective June 1, 1931, Sun's contract anniversary for refunds on motor oil and lubricants was:

```
  0 to   4 barrels......none
  5 to   9 barrels......1¢ per gal.
 10 to  19 barrels......2¢  "    "
 20 to  34 barrels......3¢  "    "
 35 to  49 barrels......4¢  "    "
 50 to  99 barrels......5¢  "    "
100 or over............6¢  "    "
```

64. For the period 1932 to the latter half of 1949, inclusive, no fixed motor

oil ratio had been printed in the supply agreement forms. Minimum monthly quantities for motor oil were expressed in so many gallons without any reference to gallons of gasoline purchased. In some instances, however, a ratio figure rather than a gallonage figure was typewritten in the agreement. These ratios ranged from 1 to 50 to 1 to 75, depending on the locality of the dealer.

65. In the early and middle thirties because of the economic conditions prevailing, third grade gasoline appeared on the market in quantity. Many dealers found it desirable to sell the lower priced gasoline in addition to one or more higher priced or better known brands of gasoline. As a matter of policy, Sun was strongly opposed to dealers selling a cut-rate gasoline along with Sunoco gasoline. To combat this practice, Sun adopted and enforced a policy of requiring such dealers to agree to discontinue the sale of the third grade gasoline as a condition to being permitted to sell Sun gasoline.

66. In the latter part of 1934, Sun adopted an amendment for agreements with undivided stations. This amendment provided that the dealer would lose the benefit of the ½¢ differential as soon as he received on his premises any gasoline and/or motor oil or grease other than the Sunoco brand.

67. In January of 1935, Sun put out a new supply agreement (Form S–290) for undivided "A" dealers with a "term clause" stating that the duration of the agreement would be for 36 monthly periods with the sole option in Sun to cancel the agreement at the end of any one of the monthly periods by giving 30 days' notice before the additional monthly period would otherwise commence; and after the expiration of the 36 periods, the term was to be continued from year to year unless either party gave the other 30 days' written notice prior to the end of the current term of his or its desire to terminate the agreement. According

to what would seem to be its initially intended purpose, this rather roundabout thirty-day clause and the subsequent direct one in Form S–407 [12] was successfully used by Sun to require dealers to relinquish selling third grade gasoline at cut-rate prices side by side with Sunoco or else have his supply agreement with Sun cancelled.

68. A memorandum dated February 15, 1935, entitled "Marketing Policy for Blue Sunoco Motor Fuel", provided as follows:

"All new accounts, or renewals thereof, must be made on Form S–290 which permits cancellation by either party on 30 days' notice. We, of course, desire to, whenever possible, change split accounts into 100% customers. This, however, may not always be possible.

"We should withdraw our equipment as promptly as our legal position will permit from all split accounts where cut price products are sold, whether they be the third grade of the major companies or independent brands. In other words we will not permit our Motor Fuel to be sold at the same station with products that do not sell at the regular posted price of nationally branded motor fuel in that district."

69. Beginning in 1935, Sun, for a period of about three years, ceased the direct operation of stations except for a limited number of training stations, and leased them to others. In so doing, Sun gave preference to its former employees and sought to have such stations operated in the same manner as Sun had in the past. In August of 1935, Congress passed the Social Security Act under which employers became liable for employee social security tax.

70. In April of 1936, Sun, on the advice of its legal department, revised the supply agreement and also the combined lease and supply agreement forms under

12. See Finding of Fact No. 71 post. In June of 1935, Form S–290 was revised in form but not in substance by Form

S–401, and for the time being this form was used with divided "A" dealers.

which it sold Sunoco petroleum products and leased service stations. All stipulations for the exclusive handling of Sunoco products and restrictions on the handling of additional brands of competitive products were omitted as were the provisions for cancellation upon twenty-four hours' notice and for liquidated damages. Leases, designated "Real Estate Leases", were drawn so that they concerned themselves solely with matters relating to real estate and Sun's storage equipment. And although a 30 day cancellation clause was omitted from the supply agreement forms for "AA" dealers, the following clause was inserted in such forms: "The term of this agreement shall commence * * * and continue in full force and effect for a period of one (1) year and from year to year thereafter, provided, however, either Company or Lessee may terminate this agreement by giving to the other thirty (30) days' written notice prior to the end of the first six (6) months of said term, or prior to the end of any ensuing period of six (6) months. * * *"

71. In May of 1936, Sun amended the term clause of its supply agreements for "A" dealers by adding the following undisguised 30 day cancellation clause to be exercised solely by Sun: "* * * provided nevertheless, that Company may cancel and terminate this agreement at any time by giving Dealer thirty (30) days' written notice." This proviso first appeared in Form S–407 10M 5–36, and it appeared in future forms long after the third-grade gasoline problem ceased to exist.

72. The new agreement forms and leases were transmitted to responsible personnel in Sun's marketing area with instructions that the new forms were to be used in contracting with new accounts and that all existing dealer agreements were to be replaced by the new forms on the expiration of the current term. When the new supply agreement forms for "AA" dealers were executed, the amounts in the minimum quantity clauses were either left blank or the words "None" or "No minimum requirements"

were typewritten in the space. Since the issuance of these new forms all new "AA" dealers have executed both a supply agreement and a lease, in contrast to the prior practice of signing a single document designated as a lease which covered the entire transaction. And except in financing transactions, the practice of leasing stations from dealers and re-leasing them back to them was discontinued by Sun.

73. The change in the printed agreement forms did not mean a reversal of its former sales policy, for Sun believed that with the short term cancellation clause coupled with vigorous, aggressive salesmanship, it could attain the same result as was obtained with the exclusive dealing provision in the prior agreements. And even with the "control" provisions omitted from the agreement, Sun, as formerly, never leased a station to an "AA" dealer unless he agreed to handle Sunoco gasoline and/or motor oil on an exclusive basis.

74. The most significant development influencing Sun's decision to revise its agreement forms was the adoption of chain store tax legislation by one state after another in Sun's marketing area. Some of these chain store taxes provided for a rate as high as $500 a year per outlet for supplies having a large number of retail establishments within a single state, with the result that a supplier, like Sun, could be held liable for as much as $1,000,000 or more annually for the privilege of doing business on the chain-outlet basis in any one state. The potential liability for taxes under these statutes was not to be based upon "ownership" or "management" of outlets, but upon "control" over them. In addition under the Social Security Act, suppliers "controlling" stations might possibly be held liable for social security tax payments on the profits of dealers and the wages of station attendants. Thus all provisions in the agreements from which Sun thought that control over the dealer could be construed were eliminated by it to forestall the possibility of tax liability

on its part under the federal and state legislation.

75. In 1936, Sun's petroleum products were on sale at 9,747 outlets, 9,185 or 94.23% of which were "A" dealers, and 562 or 5.77% were "AA" dealers, supplied directly by Sun. The sale of Sunoco gasoline to these dealers was 494,-515,217 gallons at a price of $46,725,-879, and Sunoco motor oil and lubricants 5,509,667 gallons at a price of $2,-283,405. The average gallon of motor oil to gallons of gasoline was approximately 1 to 90.

76. In October of that year when the number of Sun stations totaled 9,546, the number of undivided stations was 6,518 or 68%, and the divided was 3,028 or 32%.

77. During the year 1937 Sun conducted a survey which caused it to change its marketing approach to motor oils and TBA. This survey revealed that in many respects outlets selling Sunoco products were below par in that their physical equipment was inferior, they were short on proper lubrication facilities and their gallon ratio of motor oil sales to gasoline was poorer than that of competitive outlets. In many cases Sun outlets found it necessary to carry one or more competitive motor oils. Moreover such outlets were selling approximately 2,000 less gallons of gasoline per month than the 14,000 gallon average of competitive stations, and they were distinctly behind in the handling of TBA.

78. In the latter part of 1937 Sun issued charge account cards to motorists whose credit rating met its approval. These cards were to be used for buying Sunoco products on credit. When a dealer was permitted to honor these cards under a written agreement which could be canceled at any time, Sun would reimburse him for "all credit sales of Sunoco products or other merchandise and services designated" by Sun which the dealer makes to customers possessing the charge account cards. Despite the fact that dealers were not permitted to include the retail price of competitive products in credit sales, Sun refused to allow dealers who did not sell Sunoco gasoline and motor oils exclusively to honor such cards or permit them to indicate to motorists that they could do so. If a dealer was discovered to have been selling competitive motor oil after having been given permission to honor the credit cards, Sun would withdraw the privilege by canceling the agreement. The reason advanced by Sun for its refusal to grant or to withdraw such privilege was that dealers carrying competitive products would charge the sale of those items on credit sales to customers possessing Sun credit cards, and that the only way it could avoid subsidizing the sale of such competitive products was to refuse to grant or to withdraw the privilege of honoring charge account cards to those dealers.

79. Further, as a result of the survey, Sun, in the early part of 1938, inaugurated a systematic A to Z lubrication service and widely advertised that it would guarantee the proper lubrication of motor vehicles to those who used the service at stations displaying the A to Z lubrication signs. Sun urged all its dealers, where possible, to construct lubritoriums and to accept Sunoco A to Z lubrication franchise. In addition to having to be qualified and equipped to render the type of lubrication service of the standard for A to Z lubrication, the dealer had to purchase a complete inventory of Sunoco automotive lubricants, and agree to follow the systematic lubrication service as outlined in the Sunoco Lubrication Guide. However Sun would not allow dealers carrying competitive oils and greases to display, or to continue to display A to Z lubrication signs and banners, even though they had the necessary equipment to perform the proper lubrication service. Sun's guaranty, of course, presupposed the use of Sunoco lubricants exclusively in the A to Z service.

80. In addition, Sun urged its dealers to stock and sell TBA, and issued recommended model inventory lists based on the experience of dealers whose stations were successful in marketing TBA. The

dealers were left free to purchase any of the recommended TBA items from distributors of their own choosing.

81. Sun then reversed its thirty-six year old practice of distribution which had permitted it to sell petroleum products on a large scale thus enabling it to get in contention and keep pace with the leaders of the industry. It adopted the policy of refusing to enter into new supply agreements with dealers having divided stations and thereafter selected dealers who agreed orally or indicated their willingness to devote their entire efforts to selling Sunoco gasoline and/or motor oil before entering into a supply agreement with them. Also about this time Sun began to put into high gear the practice of eliminating the unfavorably located stations with poor volume purchases of gasoline and motor oil. This process of weeding out stations which did not fit into its franchise plan of distribution was called "Objective Development Plan" by Sun.

82. Effective October 10, 1938, Sun's schedule of prices for dealers contained a provision for refunds each time the dealer's agreement had an anniversary of its commencement, as follows: ·

## Quantity Refunds

| | | |
|---|---|---|
| 1 to 599 gallons inclusive | ........ | none |
| 600 to 1199 " " | ........ | 2¢ per gallon |
| 1200 to 1799 " " | ........ | 3¢ " " |
| 1800 to 3799 " " | ........ | 4¢ " " |
| 3800 or over | ........ | 5¢ " " |

## Ratio Refunds

A refund of one cent (1¢ per gallon on the total quantity of Sunoco Motor Oils and Automotive Lubricants purchased and paid for by Dealer while this price schedule is in effect, shall be paid by Company to dealer each time the Dealer's Agreement * * * has an anniversary of its commencement, if a ratio in Dealer's purchase thereunder is maintained of one gallon of Sunoco Motor Oils and Automotive Lubricants to Sixty (60) gallons of Blue Sunoco Motor Fuel. * * *

In computing quantities for refunds, the dealer was allowed to take eight pounds of automotive lubricants as the equivalent of one gallon of motor oil. In addition a dealer received a discount of six cents a gallon when he bought 100 cases of motor oil at one time.

83. In 1939, 1,089 of Sun's "A" dealers, a drop of 2,119 within three years, were still unpersuaded to operate as undivided Sun stations and continued to pay Sun and their other suppliers ½¢ more per gallon of gasoline.

84. On October 23, 1939, Sun entered into a so-called "override" agreement with U. S. Tire Dealers Corporation, a subsidiary of United States Rubber Company. In return for " * * * the general cooperation and merchandising assistance of your sales promotion department in connection with our sale of U. S. Brand tires, tubes, batteries and accessories to your service station dealer and wholesale distributor customers, including the use of U. S. Brand product in your T.B.A. course of your service station training schools, and your permission to present our merchandising and sales promotion programs at your sales meeting for dealers * * * ", U. S. Tire Dealers Corporation agreed to pay Sun commissions of from 7% to 8½% on all sales of U. S. Brand TBA by the former to Sun dealers and wholesale customers.

85. During the period of November 1939 to about March of 1944, Sun required its dealers to execute a U. S. Tire Dealer's franchise as a condition to becoming or continuing as a Sun dealer.

Although the franchise agreement form used by U. S. Tire Dealers did not require the Sun dealer to purchase any specific amount of U. S. Brand TBA, he was expected by Sun to give preference to the U. S. Brand products when such line contained the items desired by the dealer.

86. In 1940 Sun was among the major oil companies named defendants in a complaint filed by the United States, charging, among other things, that each had violated the anti-trust laws by allegedly requiring their respective dealers to handle their products exclusively. This complaint was not dismissed until about the time the complaint in the case before us was filed. Thus officials of Sun were aware that the Department of Justice was actively investigating its marketing policies at least for ten years prior to the filing of the instant complaint.

87. After the intervention of World War II, gasoline was rationed and credit sales of petroleum products were prohibited. On April 20, 1942, the Office of Petroleum Coordinator for National Defense recommended that until further notice:

> § 1508.50 Exclusive-dealing. No person, natural or artificial, shall after the effective date hereof, convert, or cause to be converted, by any means or devise whatsoever, any retail outlet from a non-exclusive or so-called "Split" account to an exclusive or so-called "100 per cent account." [13]

In addition the shortage of TBA items became acute. As a consequence the business of service station operators dropped considerably. Since the local U. S. Brand TBA distributors did not make their supplies available to Sun dealers, Sun, in order to help its dealers, went into the TBA business on a limited scale. It purchased tires, batteries and other automobile replacement parts at whole-sale from manufacturers in its marketing area and sold them directly to its dealers. But as time went on, it increased its purchases of TBA items.

88. Effective January 1, 1945, Sun's dealer price schedule for TBA, for the first time, provided for a percentage refund on a progressive scale of from 1 to 8% based on annual dollar volume purchases, and a ratio refund based on a certain dollar volume to purchases of a thousand gallons of gasoline. See Finding of Fact No. 39, supra.

89. By July of 1946, Sun's policy of converting divided accounts to exclusive Sunoco gasoline stations had been so successful that, not counting those stations in the Detroit, Michigan, area that sold Benzol gasoline along with Sunoco, only 198 such accounts remained. In that month Sun adopted the policy of *withdrawing* from all divided stations. It decided that at the expiration of the contract term or sooner, unless the dealer agreed to convert his station to an undivided Sun account, the supply agreement would not be renewed and termination or cancellation notice would be sent to him. Within three months the number of divided stations had been reduced to eighty-eight. During this period twenty-six divided dealers in a single district were canceled simultaneously.

90. After the restriction on credit sales was removed in 1946, Sun permitted all undivided stations selling gasoline to honor Sun charge account cards since the major competitors of Sun were carrying out a liberal policy in connection with credit sales at their stations.

91. In 1946, as a result of the advancements made in the solvent refining process during the war by which ordinary crude oils could be refined into motor oils of high quality, Sun began marketing a "premium grade motor oil, which had been in production for some

---

13. In reply to a letter by the assistant Western Region sales manager seeking advice as to the continuation of their present efforts to sell Sunoco products, particularly motor oil, in view of § 1508.-50, the acting general sales manager wrote on June 5, 1942: " * * * I am going to answer this by asking you the question 'What would you do if you were the salesman in the territory and what do you think competitive companies are doing?' "

months previous, under the trade name "Dynalube." This product has been stated to possess outstanding wear characteristics as well as low carbon-forming qualities. Sun believed that "Dynalube" was as good as the other "premium" grade motor oils then on the market, since it had a viscosity index allegedly greater than the Pennsylvania grade oils. Thus, after the war, Sun was in a position to offer its dealers a "premium" motor oil in addition to the regular grade "Mercury-Made." It therefore could see no reason why its dealer should continue to sell the competitive oils even though they had stocked these oils in the past.

92. Although the supply of "Dynalube" was plentiful at its refineries, Sun did not require dealers to stock this motor oil at that time because there was a container shortage which prevented the free distribution of the product to the dealers. However, Sun did not wait until the container shortage disappeared before starting a campaign to drive out competing motor oils and TBA at stations selling Sunoco gasoline in order to make room for "Dynalube" and Sun's sponsored TBA. It therefore decided to make a detailed survey of the dealers and service stations and also to check upon the performance of its sales organization for the purpose of ascertaining the direction in which additional sales effort should be applied. To that end it used inspectors to make written reports on its dealers in some of the regions in Sun's marketing area. Similar, although not as comprehensive, surveys had been made in the latter thirties and early forties in other portions of Sun's marketing area.

93. The inspectors' reports contained a list of questions seeking information concerning, among others, the following: (a) Type of supply agreement and its expiration date; (b) Location of the station and the type and condition of the building and equipment; (c) Lighting conditions and the appearance of rest rooms; (d) Number and the appearance of station attendants, their hours of operation and the extra services given motorists; (e) Complaints of the dealer and his attitude toward Sun; (f) Average monthly gasoline and the ratio of Sun motor oil to gasoline purchased; (g) Whether the dealer had an A to Z service franchise; (h) Line of TBA, and (i) Whether competitive motor oils and TBA are being displayed and sold, and the brands of those competitive products.

94. The inspectors personally visited the stations assigned to them and obtained the information sought in the reports. The completed reports, in addition to revealing that most of the dealers' purchases of Sun motor oil were less than the ratio of one gallon to every sixty of gasoline, showed that the dealers, with few exceptions, were selling competitive TBA and motor oils, with the Pennsylvania grade oils being the main culprit.

95. After these inspectors' reports were received and reviewed at the regional office, they were sent to the various district offices within the region, with notations thereon or in accompanying letters of "deficiencies" to be corrected. In almost every instance the deficiencies noted included the matter of dealers advertising, displaying and selling competitive products.

96. The district supervisory personnel, either orally or in writing, brought the "deficiencies" to the attention of the salesmen for corrective action. They informed the salesmen to instruct the dealers (and that they could go so far as to tell them that they had thirty days in which to comply) to eliminate competitive motor oils and TBA, or else their agreements would either be canceled or not renewed and a new dealer obtained to take their place.[14]

14. For example, one of the memoranda sent by a district manager to his salesmen in May of 1948, states:

"Attached hereto are copies of the inspectors' reports, one for each dealer. While considerable progress has been

97. The salesmen called on the dealers who were selling competitive motor oils and TBA and used the selling approach by pointing out to them the advantages of devoting their efforts to selling Sun products exclusively: they could do a better job in selling the products of a single company, their bookkeeping would be simpler, and they would receive annual rebates in the higher brackets on Sun motor oils and sponsored TBA. As a result, a majority of the dealers, some of them mindful of the thirty day cancellation clause, agreed to go along 100%. This meant removing all signs displaying brands of competitive products [15] on the premises and to discontinue the selling of competitive products at the earliest possible moment if they wanted to do business with Sun. A number committed themselves to discontinue to sell competitive products if Sun would keep them supplied with the necessary grades of motor oil and items of TBA. They agreed to do so despite the fact that they could often purchase competitive motor oils and TBA from local sources under better delivery conditions and at lower prices and that they preferred to sell competing brands because of customer demand and better customer acceptance. Those dealers who agreed to go 100% Sun after their "old" stock of competitive products was depleted were subsequently checked by the inspector or salesman to see that the old stock was not replenished.

98. Sometimes Sun would either make at nominal cost to the dealer or grant him a substantial allowance or credit for repairs or improvements of his station to induce him to go along 100% with Sun. It also used indirect methods to have dealers operate their stations according to its requirements, such as tardy deliveries of gasoline, delaying needed repairs to dispensing equipment and signs, and withholding needed additional storage and dispensing equipment.

99. When some of the dealers were undecided what to do, the salesmen reminded them of Sun's right to cancel the agreement on thirty days' notice, and if they did not go along 100%, they would be replaced by a new operator or their station would be replaced by another Sun outlet nearby. As a result of such "reminders", some of them either discontinued the sale of the competitive items or ceased stocking them to any substantial degree. In the latter situation, the competitive products were not prominently displayed or were stored out of view of the salesmen. In other cases some of the dealers were obstinate.

100. After they had taken action, the salesmen reported their efforts to their superiors who, in turn, with or without comment, returned the reports to the regional office. Their efforts in almost every instance related to what had been done and was being done to eliminate

---

made in some territories, it appears that there has been some backsliding in others. I refer particularly to other oils in the location.

    \*    \*    \*    \*    \*

"We do not care to continue in a location where the above condition prevails. I do not care about any reasons present or past that have caused dealers to follow the lines of least resistance and stock other oils. You are to inform such dealers to find another supplier. They may buy any product they have in mind to, but we also have a right to protect our good name and to sell to those dealers who understand our products well enough to want to help us preserve it. I feel very strongly about this, and you are held personally responsible to have this situation cleaned up

once and for all within the next thirty days and no exceptions. We shall be happy to apply the gallonage from cancelled accounts to our real Sunoco dealers.

"Please examine each report carefully. On all reports showing other oils carried and on which a notation has not already been made showing that the item is being discontinued, I want a notation stating the dealer's decision to either cancel or carry our lubricants only within the next thirty days."

15. A manager of the Toledo, Ohio district was able to report to his regional manager on June 17, 1948: "To the best of our knowledge there are only six signs out of 154 dealer stations which are advertising these competitive products."

the advertisement, display and sale of competitive products at Sun stations.

101. In those cases where the dealers proved unyielding or remained undecided, Sun sent them written notice of cancellation or termination. These notices brought some of them around to Sun's point of view, while the others ceased to do business with Sun rather than comply with its demands. This conduct of eliminating "unfavorable" dealers was far removed from "selection of customers" by Sun.

102. Effective February 6, 1948, Sun's motor oil schedule of prices for dealers provided:

Quality Refund

| | | |
|---|---|---|
| 900 to 1199 gallons inclusive | 2.0¢ | per gal. |
| 1200 to 1499 " " | 2.5¢ | " " |
| 1500 to 1999 " " | 3.0¢ | " " |
| 2000 to 2499 " " | 3.5¢ | " " |
| 2500 to 3499 " " | 4.0¢ | " " |
| 3500 to 4499 " " | 4.5¢ | " " |
| 4500 or over | 5.0¢ | " " |

The refund of one cent a gallon was made dependent upon the ratio of 1 to 55.

103. In the year 1948 when its new gasoline refinery was nearing completion in Toledo, Sun had, or anticipated having, a sufficient supply of gasoline to satisfy dealer demand in its marketing area while its large competitors were experiencing a shortage. Also about this time the war scarcity of TBA items began to vanish and such supplies were becoming plentiful. In those days there was no need for Sun to seek out new Sun dealers; they came to Sun. Since the demand for gasoline was great, Sun used its advantage to assist its campaign to drive out competitive oils and TBA from stations selling Sunoco gasoline, and to require new accounts to stock supplies of Sun's motor oils and sponsored TBA in amounts beyond their normal needs.

104. On June 7, 1948, the United States District Court for the Southern District of California enjoined the Standard Oil Company of California, and its wholly owned subsidiary, Standard Stations, Inc., from enforcing or entering into *exclusive supply contracts* with some 5,937 independent dealers in one or more petroleum products and TBA because such contracts were in violation of the antitrust laws. See United States v. Standard Oil Company of California, D.C., 78 F.Supp. 850.

105. In February of 1949, Sun received a refund check in the amount of $392,189.40 for its purchases of Kelly-Springfield tires during the year 1948.

106. In May of 1949, the total of Sun stations was 6,630. Not counting the stations selling Benzol along with Sunoco gasoline, 6,624 or 99.9% were undivided stations, and only 6 or 0.1%, as compared to 3,028 or 32% in 1936, were still divided.[16]

107. On June 13, 1949, the Supreme Court of the United States affirmed the decree of the District Court in the Standard Stations case. See Standard Oil Company of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. On page 314 of 337 U.S. on page 1062, of 69 S.Ct. of its opinion the Court stated that "the qualifying clause of § 3 [of the Clayton Act] is satisfied by proof that competition has been foreclosed in a substantial

16. Under these circumstances the ½¢ price differential in the price per gallon of gasoline in favor of the undivided station had either served its purpose or was no longer necessary.

share of the line of commerce affected." [17]

108. Beginning in July of 1949, the ½¢ differential in Sun's official posted prices and agreements for gasoline was discontinued and the thirty-day cancellation clause was removed from the remaining supply agreements with "A" dealers. In addition the minimum monthly quantity of motor oil and lubricants to be purchased clause in all supply agreements was made to be expressed in terms of a ratio of one gallon of motor oil for every sixty-five gallons of gasoline purchased during the corresponding month of the previous year,[18] and the default clause was modified slightly to provide that if the dealer failed to live up to the minimum quantity provisions in any *two* months of the twelve month period, Sun could cancel the agreement upon giving written notice.

109. By the end of 1949, Sun's petroleum products, as well as its sponsored TBA items, were being distributed through 6,562 dealers supplied directly by Sun. Of these, 4,716 or 71.87% of the total were "A" dealers, and 1,846 or 28.13% were "AA" dealers. This was a decrease since 1936 of 2,623 in the total number of all dealers, and an increase of 22.36% in the number of "AA" dealers. In that year it sold 1,020,040,400 gallons of gasoline and 14,396,369 gallons of motor oils and lubricants, or a ratio of one gallon of motor oil for every seventy-one gallons of gasoline. It also purchased approximately eleven million dollars worth of TBA from various manufacturers.

110. By January of 1950 the number of stations selling Benzol gasoline along with Sunoco in the Detroit area had been reduced from 77 in 1944 to 26.

111. On January 22, 1950, the instant action was instituted.

112. Effective October 10, 1950, the refund of one cent a gallon in Sun's dealer's schedule of prices for motor oils and lubricants was made dependent upon the attainment of the ratio of 1 to 65.

113. In 1951 a dealer in New Jersey was canceled on sixty days' notice because he refused to give up selling competitive gasoline at a station "adjacent" to his Sun station and because he refused to sell only Sun products at both stations. As late as 1955, a dealer not maintaining his 1:65 oil ratio was told by Sun that other dealers were available.

114. Although the territory in which Sun marketed its petroleum products was increased approximately 36% from 1936 to 1956, the number of dealers was reduced from 9,185 or 9,051 to 6,984.

Conclusions of Law.

1. This Court has jurisdiction over the subject matter of this action. 15 U.S.C.A. §§ 4, 25.

2. This Court has venue jurisdiction over the defendant. 15 U.S.C.A. § 22.

3. The defendant, Sun Oil Company, is and has been engaged in commerce among the several states.

4. The effect of defendant's agreements and understandings with its dealers may be to substantially lessen competition in the selling of petroleum products and "tires, batteries and accessories" in defendant's marketing area contrary to § 3 of the Clayton Act, 15 U.S.C.A. § 14. See Standard Oil Company of California and Standard Stations v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371.

5. The plaintiff, United States of America, is entitled to a decree enjoining the defendant from inducing, coercing and compelling independent service station operators with whom it does business to enter into and operate under written contracts, supplemented by oral and tacit agreements and understandings requiring them to purchase petroleum products and "tires, batteries and automotive accessories" for resale exclusively from the defendant.

17. This has been referred to as the "quantitative substantiality" test.

18. See Finding of Fact No. 28(f) and (i), supra.