SOUTH END OIL COMPANY, Inc.,
Plaintiff,

v.

TEXACO, INC., Defendant.

No. 64 C 519.

United States District Court
N. D. Illinois, E. D.

Jan. 19, 1965.

James O. Smith, Blue Island, Ill., for plaintiff.

Frank O. Wetmore, II, Winston, Strawn, Smith & Patterson, Chicago, Ill., and Paul B. Wells, New York City, for defendant.

WILL, District Judge.

This action arises out of defendant Texaco's decision not to renew its distributorship contract with plaintiff South End Oil Company, Inc. (South End) and its refusal to sell to the plaintiff thereafter, except on the less favorable terms offered "consumer" accounts. At the time of termination, South End owed Texaco approximately $14,000, for which Texaco subsequently filed suit in the state courts and secured a judgment.

South End's complaint is based on §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2 and § 2(a) of the Clayton Act, 15 U.S.C. § 13(a). Plaintiff seeks recovery of treble damages alleging the following violations by Texaco:

(1) restricting and attempting to restrict sales by South End to certain of its customers who resold Texaco products at discount prices;

(2) controlling or attempting to control South End's prices;

(3) compelling or attempting to compel South End to dictate the retail price at which its customers resold Texaco products; and

(4) seeking a monopoly in its (Texaco's) products in the area in which South End made its sales.

Plaintiff alleges that Texaco, in pursuit of these goals, limited the quantities of oil it would sell to South End; delayed delivery of products to South End; refused to sell products to South End; and, finally, terminated the distributorship contract. In addition, South End claims that Texaco unlawfully discriminated in price between it and its competitors (a) with respect to sales made prior to the termination of the contract and (b) with respect to proposed sales after the termination.

Texaco has moved for summary judgment, basing its motion on the depositions of plaintiff's president (Eustace) and auditor (Toomire), as well as its own sworn answers to the interrogatories posed by the plaintiff.

■ The Court rarely is disposed to grant a motion for summary judgment where there are substantial issues of fact raised by the pleadings. The instant case is exceptional since an examination of the pleadings, the lengthy depositions and the defendant's sworn answers to interrogatories reveal uncontroverted facts which warrant and require the granting of the motion.

■ Having fully considered these voluminous materials and the uncontroverted facts contained therein, we find (1) that the price-discrimination charge is without any basis and (2) that the facts—viewed in the light most favorable to the plaintiff—are in no way susceptible of an interpretation which would bring Texaco's conduct within the penumbra of the antitrust laws. Specifically, we find that Texaco acted unilaterally at all times; that its actions were neither part of a pre-existing conspiracy nor directed toward the formation of an illegal con-

spiracy; that it was motivated wholly by South End's failure to develop as a balanced "full-line" distributor and its poor financial condition; and that there is no evidence which even suggests the possibility that Texaco was attempting to secure a monopoly or that it was engaging in conduct which might raise a question under § 2 of the Sherman Act. The facts and case law supporting these findings and conclusions are set out below.

## I

### The Alleged Price Discrimination

Plaintiff makes two allegations of price discrimination. The first, alleging sales to competitors at lower prices during the distributorship period, is admittedly based on hearsay and the intuition of plaintiff's president. Eustace states that he "heard" that Lambie and Rasmussen (a competing Texaco distributor) was being given an additional five per cent discount. He states that a second distributor told him that he "thought" that South End could not purchase Texaco oil as cheaply as he could. Finally, Eustace relates that competitive Texaco distributors made sales to "his" accounts. Assuming that a change in consumer allegiance could only have been occasioned by a lower price, he infers that his competitors were purchasing on more advantageous terms.

Responding to this charge, Texaco has filed data culled from its sales records, showing all purchases by distributors identified by South End as its competitors, the amounts purchased and the price charged. This information is included in Texaco's answers to plaintiff's interrogatories and is sworn to be a complete and accurate résumé of the company's sales records. They show that all sales to South End and to its competitors were at identical prices.

South End rests its argument on the information which Eustace "heard" and his inferences and beliefs. It has not sought to controvert the sales data provided by Texaco, nor does it assert that it could do so upon trial, even though it has access to other sources against which the accuracy of the data might be tested. Under these circumstances, Texaco has satisfied the burden of establishing that its evidence is in fact correct and that no room for controversy exists. See 6 Moore's Federal Practice ¶ 56.15(3) and cases cited.

The second charge of price discrimination relates to Texaco's statement that any sales to South End after termination of the distributorship contract would be at twenty per cent off list, the standard discount for large scale consumers, rather than the twenty-five per cent plus five per cent discount established for Texaco full-line distributors. Plaintiff's complaint does not question the reasonableness of the differential established between distributors and nondistributors. Instead, it rests on the contention that South End, as a competitor of Texaco distributors, is automatically entitled to purchase products on the same terms accorded its competitors, the distinction between distributors and nondistributors notwithstanding. Texaco correctly points out that such preferential treatment might well violate the provisions of § 2(a) of the Clayton Act. In any case, no sales were ever made to South End at twenty per cent off list. The question of price discrimination does not arise until there are two actual sales at different prices to different purchasers. The prohibitions of § 2(a) do not extend to mere offers. "It is not enough that a prospective purchaser, the plaintiff, would have had to pay a higher price if it did buy". A. J. Goodman & Son, Inc. v. United Lacquer Mfg. Corporation, 81 F. Supp. 890, 892 (D.Mass.1949); J. T. Jones v. Metzger Dairies, Inc., 334 F.2d 919, 924 (5 Cir. 1964). Texaco is therefore entitled to summary judgment on both charges of price discrimination.

## II

### The Refusal to Deal and Related Claims

The major portion of the instant complaint rests on the contention that Texaco delayed deliveries of motor oil and finally

refused to renew the South End distributorship because South End was primarily engaged in selling motor oil to discount houses. South End takes the position that any manufacturer which delays deliveries or terminates a distributorship contract violates §§ 1 and 2 of the Sherman Act if it is motivated by a desire to maintain the price of its product, notwithstanding the fact that it acts unilaterally and does not seek an agreement, express or implied, to maintain prices.

The antitrust laws do not impose the sweeping obligation to deal reflected in the theory advanced by South End. The Sherman Act is directed toward injuries to competition occasioned by illegal agreement or the exercise of monopoly power. Acts having an adverse effect on an individual's business need not result in an injury to competition. Nor do damages, of themselves, create liability under the Sherman Act. See Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 287 (6 Cir. 1963).

In order to maintain a treble damage action for refusing to deal, plaintiff must show either (1) that the refusal is accompanied by unlawful conduct or agreement or (2) that the refusal is designed to create or maintain a monopoly. Absent such a showing, a manufacturer is free to "exercise his own independent discretion as to parties with whom he will deal" and "may announce in advance the circumstances under which he will refuse to sell." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). See also, Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Decisions of the Supreme Court and lower federal courts have fully described the scope of "unlawful conduct or agreement". There is no doubt that a refusal to deal, brought about by agreement between competing manufacturers, or between a manufacturer and one or more distributors, violates § 1 of the Sherman Act. Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct.

705, 3 L.Ed.2d 741 (1959) ; A. C. Becken Co. v. Gemex Corporation, 272 F.2d 1 (7 Cir. 1959). There is, however, no assertion here that Texaco acted in concert either with other manufacturers of motor oil or with other Texaco distributors who were competitive with South End and no evidence from which such agreement might be inferred. While plaintiff alleges that his action is brought under § 1 of the Sherman Act, he makes no reference to the existence of any conspiracy or agreement in his complaint. Texaco points out that Eustace, South End's president, indicated on deposition that the "conspiracy" was between employees and salesmen of Texaco. Such an "agreement", if any, is not proscribed by § 1. Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 200 F.2d 911 (5 Cir. 1952) cert. den. 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

Nor does South End contend that Texaco achieved or sought any price fixing agreement with it. Texaco salesmen never indicated a suggested re-sale price either to South End or to its customers and Eustace acknowledges that he never was asked to agree or agreed with anyone as to prices. Under these circumstances, we need not consider whether such an agreement would in fact have restrained competition or resulted in injury to South End.

Since no agreement is alleged, the claimed violation of § 1 must arise from acts which the plaintiff believes amount to "unlawful conduct". Unlawful conduct, however, is nothing more than a substitute for an "express" agreement. It does not eliminate the requirement of showing that a combination in fact exists.

Thus, in United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944), the Supreme Court rested its finding that § 1 had been violated on a showing of "acquiescence of the wholesalers coupled with [their] assistance in effectuating [the resale price scheme]". 321 U.S. at 723, 64 S.Ct. at 813. Where a manufacturer goes beyond the mere announcement of a policy

and a subsequent refusal to deal, employing means which effect adherence to resale prices, he has—even absent an express or implied agreement—put together a combination in violation of § 1. United States v. Parke, Davis & Company, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Parke Davis rests on the determination that the manufacturer, in "policing" its resale price system foreclosed any possibility of finding that the acquiescence of the distributors was voluntary, thus making the manufacturer responsible for fostering an illegal combination. No such systematic "policing" or other coercive action from which a combination might be inferred is alleged or disclosed here.

■ Termination of the distributorship contract does not, in itself, supply the element of unlawful conduct. See Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 8 (9 Cir. 1963). The refusal to deal must be *accompanied* by other conduct, sufficient to permit the inference that an unlawful plan exists (or is, at least, in formation). Each of the cases cited above involves conduct extending to all distributors in an area. We are not aware of any case in which a finding of "unlawful conduct" rests on the isolated experiences of one businessman. Where all of the manufacturer's alleged acts are directed at a single distributor and other distributors in competition with him do not experience similar difficulties, there is no basis for inferring that the manufacturer is acting in violation of § 1. Termination of one distributorship cannot, in itself, injure competition, where all competing distributors remain free from any restraints.

Texaco's termination of the South End distributorship does not evidence an intent either to (a) fix the price at which motor oil is resold in discount houses; (b) fix the price at which distributors make sales to discount houses; or (c) restrict or foreclose the supply of motor oil to the discount house trade. As noted earlier, South End admits that it competed for discount house business with other Texaco distributors. These distributors made sales to discount houses while South End operated as a Texaco distributor and, admittedly, made discount house sales in even greater quantities after South End lost its distributorship. None of these distributors were terminated nor does the record suggest that they have experienced any difficulties in purchasing from the defendant. While these facts might suggest the existence of an agreement between Texaco and South End's competitors, cf. Girardi v. Gates Rubber Company Sales Division, 325 F.2d 196, 203–204 (9 Cir. 1963), plaintiff does not make such a claim, either in its complaint, in the briefs filed on the instant motion, or in the course of two lengthy depositions.

The record consistently supports Texaco's claim that South End failed to live up to its contractual responsibilities as a full line dealer and had continual financial difficulties which, as plaintiff admits, were a result of its inadequate capitalization. Under these circumstances, the Court may not deny a well supported motion for summary judgment on the mere possibility that an illegal agreement— neither mentioned by the plaintiff nor supported by any facts in a lengthy record—could theoretically have existed.

There is, therefore, no showing of either a pre-existing conspiracy or a conspiracy in formation which might suggest that Texaco's refusal to deal was "accompanied by unlawful conduct or agreement". What remains is South End's allegation that, on numerous occasions during the term of the distributorship, and at the time of termination, various Texaco salesmen and executives advised plaintiff *inter alia* that he was "selling in the wrong channels" and at the wrong prices and that Texaco was not pleased to find that its motor oils were being widely advertised at discount prices. For the reasons already stated, we cannot conclude that these "informational" statements, admittedly not directed toward securing any agreement, fall ouside the bounds of lawful activity sanctioned by the Supreme Court in Colgate. Such unilateral action cannot, of itself,

supply the element of "unlawful conduct" required to make a refusal to deal a violation of § 1. Cf. House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 870 (2 Cir. 1962).

Plaintiff does refer to three or four specific "incidents" where Texaco representatives allegedly approached Eustace and inquired if he sold to certain discount houses. In one instance he was asked to speak to one of his customers and request the removal of a large sign advertising the discount price; on another he allegedly was asked and agreed not to make sales to a certain outlet (which South End had never sold to nor, evidently, had ever considered selling to). Assuming, *arguendo*, that possible antitrust violations inhere in these incidents, plaintiff admits that none of them caused him to change his selling practices nor effected any changes in the practices of his customers. There is, therefore, no basis for claiming any injury as a result of these occurrences. Texaco points out that, in any event, these allegations refer to acts occurring more than four years before the date of the instant complaint and are therefore barred by the statute of limitations, § 4b of the Clayton Act, 15 U.S.C. § 15b.

Moreover, after a thorough consideration of the record, the Court concludes that the only reasonable explanation of these incidents is that they were unconnected, isolated occurrences, bearing no relation to the difficulties which South End later experienced with regard to delayed deliveries or the termination of its distributorship. The record shows that contemporaneous with these "incidents", Texaco was doing its utmost to assist plaintiff in its business and repeatedly indicated that it was willing to sell plaintiff all the motor oil he could use, knowing full well that it would be resold through discount outlets.

Thus these "incidents" do not require any modification of the conclusion already expressed, i. e., that the record does not disclose any course of conduct by Texaco which would permit South End to recover the treble damages it seeks. In particular, the record leaves no doubt that all parties understood that the delays in accepting South End's orders for motor oil were occasioned by the action of Texaco's Credit Department resulting from the fact that South End was continually indebted to Texaco in amounts ranging between $15,000 and $28,000. On a few occasions, delivery was delayed because motor oil was in short supply, given the needs of other distributors to whom Texaco was also contractually bound.

For the reasons stated above, we conclude the facts alleged by South End, assuming their accuracy, do not, when viewed in conjunction with the admissions in plaintiff's depositions, state a cause of action under § 1 of the Sherman Act.

### III

#### The Alleged Violation of the Sherman Act, § 2

Plaintiff's claim under § 2 of the Sherman Act is apparently based on the contention that Texaco is attempting to monopolize the market for Texaco motor oils, in that competition between Texaco's retail service stations and South End's discount house customers is foreclosed by the termination of South End's distributorship. This allegation is without basis in law or fact.

As a factual matter, plaintiff admits that other Texaco distributors were selling to discount houses before and are now selling Texaco motor oils to discount outlets in even greater quantities. This negates any inference that Texaco is engaged in an attempt to protect its higher priced retail service station outlets. Moreover, South End now competes with the Texaco distributors, selling its own brand of motor oil. Termination of the distributorship contract thus in fact increased competition by opening up a new outlet for competitive products. See House of Materials v. Simplicity Pattern Company, supra, 298 F.2d at 871.

As a legal proposition, plaintiff's monopolization argument cannot be sustained. The product market cannot be restricted in the manner in which South

End suggests, particularly in light of Eustace's testimony that all premium motor oils are comparable and competitive. Where commodities are competitive and reasonably interchangeable, the relevant market cannot be confined to the products of one manufacturer. United States v. E. I. Du Pont De Nemours & Company, 351 U.S. 377, 393, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Even if the product market could be limited simply to *Texaco* motor oils, plaintiff could not show an injury to competition. The only claim is that South End was excluded from the market, in particular the discount houses to which it had been making sales. Inasmuch as other Texaco distributors admittedly compete freely for the same trade and make sales to other discount houses as well, no injury to competition can be found, even with respect to Texaco motor oils. Under the Colgate doctrine, Texaco, acting unilaterally, could lawfully terminate all distributors who sold to discount houses and refuse to make direct sales as well. Such action would, as noted above, increase competition in motor oils so long as the market— taken as a whole—was freely competitive. South End admits that it is and no evidence to the contrary has been suggested.

### IV

### Conclusion

In summary, the record before the Court discloses the following:

1. Texaco did not discriminate in the prices which it charged plaintiff and competing distributors.

2. After termination of plaintiff's distributorship, Texaco offered to sell plaintiff at the same discount as large scale consumers who were not full line distributors but, in fact, no sales at such discounts were made.

3. Texaco did not refuse to deal with plaintiff and has not refused to deal with other distributors because they sold to discount houses which in turn sold oil and other Texaco products at lower prices than Texaco service stations.

4. Texaco never sought any resale price agreement from plaintiff or other distributors, nor did it seek to fix resale prices by any other action.

5. Plaintiff's distributorship was terminated by Texaco because of plaintiff's failure to live up to its contractual obligations as a full line distributor and its continued inability to pay for its purchases without requiring the extension of credit in unusually large amounts.

In the light of the foregoing, defendant's motion for summary judgment is granted without costs. An appropriate order will enter.