TIRE SALES CORPORATION, a
corporation, Plaintiff,

v.

CITIES SERVICE OIL COMPANY, a
corporation, Defendant.

No. 74 C 599.

United States District Court,
N. D. Illinois, E. D.

March 4, 1976.

Robert W. Bergstrom, Chicago, Ill., for plaintiff; Bergstrom, Davis & Olson, Chicago, Ill., of counsel.

Samuel J. Betar, Jack W. Grady, Chicago, Ill., for defendant; Schippers, Betar, Lamendella & O'Brien, Chicago, Ill., of counsel.

## MEMORANDUM OPINION

GRADY, District Judge.

Prior to January 1, 1971, the plaintiff, Tire Sales Corporation, was a distributor for the defendant, Cities Service Corporation (hereinafter sometimes called "Citgo") of automotive tires, batteries and accessories ("TBA") for resale to Citgo dealers on the south side of Chicago. This treble damage antitrust action arises from the termination of the dis-

tributorship agreement by Cities Service and the alleged subsequent elimination of Tire Sales from the market of wholesale sales to Citgo dealers.

Tire Sales filed its complaint under Section 4 of the Clayton Act, 15 U.S.C. Sec. 15, alleging a tying arrangement, group boycott, allocation of markets, exclusive dealing and reciprocal dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1, and Section 3 of the Clayton Act, 15 U.S.C. Sec. 14. In addition, Tire Sales alleges that Cities Service monopolized, attempted to monopolize and conspired to monopolize the sale of TBA to Citgo dealers in violation of Section 2 of the Sherman Act, 15 U.S.C. Sec. 2. Cities Service denies the alleged violation and counterclaims against Tire Sales for the purchase price of certain goods. Individual counterdefendants are two shareholder officers of Tire Sales, George Nordstrom and Edward Laughlin, alleged guarantors of payment.

The parties have each filed motions for summary judgment, supported by various depositions, affidavits, answers to interrogatories, and other documents.[1]

An understanding of this case requires a description of the distribution of petroleum and TBA to Citgo dealers. Citgo dealers are independent businessmen who enter into separate agreements with Cities Service to lease service stations and to buy petroleum products. The agreements are for terms varying from one month to one year, and are terminable upon notice of from one month to 90 days.

In its sales of TBA to its dealers, Cities Service uses what is called the "purchase-resale" system. Under this method, it purchases the products from manufacturers and resells them to a distributor, which, in turn, resells to the dealer. The products are shipped directly from the manufacturer to the distributor, with Cities Service being billed. Cities Service makes its profit by charging the distributor a higher price than it pays the manufacturer. The defendant does not explicitly require its dealers to purchase TBA from its distributor; according to Cities Service, its dealers are free to purchase whatever brands of TBA they choose from whatever distributors they choose.

The purchase-resale method of TBA distribution was first used in late 1965. Until then, Cities Service, along with other major oil companies, used the "sales-commission" system, in which the oil company agreed to "sponsor" the sale of a certain manufacturer's TBA to its dealers in exchange for a commission from the manufacturer. This differed from the purchase-resale method in that the oil company did not purchase the product itself, but instead acted as a sales agent. Cities Service abandoned the sales-commission method after the Federal Trade Commission successfully challenged its use by other companies. As will be more fully explained below, the sales-commission plan was held to be a violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. Sec. 45, in *Atlantic Refining Co. v. F. T. C.,* 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); *F. T. C. v. Texaco, Inc.,* 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968); and *Shell Oil Co. v. F. T. C.,* 360 F.2d 470 (5th Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).

The amount of business involved in Citgo's TBA sales is considerable. Cities Service's records show that in 1972 its purchases of TBA for direct or indirect resale to its dealers in the Chicago area totaled over $900,000.00.

Under both the sales-commission and purchase-resale systems, the tire company whose products Cities Service sponsored on the south side of Chicago was, until January 1, 1971, Uniroyal, Inc.[2]

---

1. Tire Sales' motion is for summary judgment on the issue of liability alone.

2. Although during part of the relevant time period the company was known as United States Rubber Co., we will, for convenience, refer to it only as Uniroyal.

Because it was then a Uniroyal distributor, Tire Sales was used by Cities Service as its distributor. Cities Service terminated its agreement with Uniroyal in late 1970 and entered into contracts with Firestone and Goodyear instead, allegedly because of the declining public acceptance of Uniroyal tires. (It should be noted, however, that Tire Sales' purchases of Uniroyal tires under Cities Service's purchase-resale plan increased dramatically in 1970 over the previous two years.[3]).

Cities Service, apparently reluctant to lose Tire Sales as a distributor, attempted to aid Tire Sales in efforts to obtain a Goodyear or Firestone distributorship. These efforts proving fruitless, Cities Service replaced Tire Sales with Berry Tire Company, a Goodyear and Firestone distributor.

Although Cities Service asserts that its dealers are not required to buy its TBA, Tire Sales' business among Citgo dealers was destroyed after the termination of its distributorship contract. In 1971, its sales to Citgo dealers were less than a tenth of what they had been the previous year, and the following year they fell to zero.

The parties sharply dispute the reason for the capture of the Citgo wholesale market by Berry. Cities Service contends that it was the result of legitimate sales efforts directed by it and Berry at the dealers. It denies that any coercion was used. Its salesmen, often in the company of Berry personnel, made weekly trips to the stations to discuss TBA sales. Defendant also provided TBA advertising and display material for the stations. In addition, Cities Service several times a year helped sponsor "TBA Fairs," at which Citgo dealers, generally after being treated to drinks, dinner and door prizes, were solicited for TBA products available through the "approved" distributor. One of these Fairs, called a

"Spring Fling," was held by Cities Service and Berry at Berry's warehouse on March 31, 1971, for the purpose of acquainting the dealers with Berry.

According to depositions of several present and former Citgo dealers, Cities Service engaged in more than mere salesmenship. For example, dealers testified that if they failed to buy from Berry, they were threatened with cancellation of their leases, and one dealer testified that Cities Service refused to make needed repairs of the station premises. Several dealers who refused to buy from Berry had their leases terminated or changed to shorter terms shortly thereafter. One such dealer terminated the lease himself after his yearly lease was replaced with a monthly one. There is no direct evidence in the record, however, that the failure to buy from Berry was the cause of termination of a lease.

In its counterclaim, Cities Service asserts, and the counterdefendants do not dispute, that Tire Sales has failed to pay for goods received from Citgo during 1970–71 and that Nordstrom and Laughlin have failed to pay under their personal guarantee. The counterdefendants' only defense is that the claim arose in the course of Citgo's violations of the antitrust laws.

In disposing of the cross motions for summary judgment, we observe at the outset that summary judgment is frequently inappropriate in antitrust cases, "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962). In deciding these cross motions, the evidence must be viewed most favorably to the party opposing the motion. *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969).

---

3. In response to an interrogatory, Cities Service reported that sales of tires to Tire Sales increased from $88,359.00 in 1968, and $83,-568.00 in 1969, to $143,175.00 in 1970.

## TYING ARRANGEMENT

■ When the evidence is so viewed, we must deny both parties' motions as they pertain to the tying-arrangement aspect of this case. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545, 550 (1958). The practice is made illegal by Section 3 of the Clayton Act if the tying product is a commodity; otherwise, it is outlawed by Section 1 of the Sherman Act. Thus, in the present case, if TBA is regarded as tied to sales of petroleum products, the practice violates the Clayton Act; if the tie is only to the service station leases, it violates the Sherman Act.[4] *See Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir. 1969), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

■ The law looks at tying arrangements with such disfavor that, if certain threshold elements are present, they are regarded as *per se* illegal, despite any possible defenses on grounds of reasonableness that may be offered. *Northern Pacific, supra,* 356 U.S. at 5, 78 S.Ct. at 518, 2 L.Ed.2d at 549. To apply the *per se* rule, it must be shown, first, that there is in fact a tying arrangement. Second, the defendant must possess sufficient power in the market for the tying product to impose an appreciable restraint in the market for the tied product. Finally, a not insubstantial amount of commerce in the tied product must be involved. In Clayton Act cases, the plaintiff must prove only one of the last two elements; in Sherman Act cases, both of them. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

■ We find a genuine dispute as to whether the first of these elements is present. The plaintiff has produced evidence that the defendant coerced its dealers into buying TBA from Berry. Such coercion included threats to cancel service station leases and refusal to perform repairs. If the defendant proves these allegations at trial, a tie-in would clearly be established.[5] Even in the absence of overt coercion, dealers may have been induced to purchase from Berry Tire because of the inherent power which the defendant possessed as the company upon which the dealers depended in almost every aspect of their business. In *F.T.C. v. Texaco, Inc.,* 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968), the Supreme Court held that the sales-commission method of TBA distribution violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. Sec. 45, because the oil company, as a result of the inherent nature of the petroleum distribution system, exercised dominant control over its dealers in inducing them to buy sponsored TBA products. No overt coercion was used. *See also Shell Oil Co. v. F.T.C.,* 360 F.2d 470 (5th Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). Although the court was dealing with the F.T.C. Act, we interpret its discussion, essentially one of factual interpretation, to be applicable to the Sherman and Clayton Acts

---

**4.** The plaintiff in a private tying-arrangement case is usually a party upon whom the tie-in has been imposed, rather than the defendant's competitor, as here. However, because the plaintiff alleges a direct injury by the restraint, it has standing to sue. For another tie-in suit brought by a competitor, see *Advance Business Systems & Supply Co. v. SCM Corp.,* 415 F.2d 55 (4th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

**5.** *Osborn v. Sinclair Refining Co.,* 286 F.2d 832, 836 (4th Cir. 1960), *cert. denied,* 366 U.S.

963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); *United States v. Sun Oil Co.,* 176 F.Supp. 715 (E.D.Pa.1959); M. E. Wheeler, *Some Observations on Tie-ins, the Single Product Defense, Exclusive Dealing & Regulated Industries,* 60 Cal.L.Rev. 1557, 1571 (1972); *cf. Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658, 662 (1969). In *Phillips v. Crown Central Petroleum Corp.,* 395 F.Supp. 735 (D.Md.1975), the tie-in was incorporated in the dealer contract.

**1228**

as well.[6] The plaintiff has produced facts similar to those involved in *Texaco* and *Shell*; if believed, they would show that the reason dealers were buying TBA from Berry rather than Tire Sales was that Berry was the defendant's distributor and not because Berry's TBA were inherently preferable.[7]

▮ The defendant, however, has disputed the evidence presented by the plaintiff and has produced evidence that during 1970 it was disturbed by what it perceived to be a declining public acceptance of Uniroyal Tires, and therefore transferred its business to Goodyear and Firestone. On the evidence before us, it is conceivable that the Citgo dealers, either on their own or because of salesmanship efforts limited to this one selling point, came to the same conclusion. *Osborn v. Sinclair Refining Co.,* 286 F.2d 832 (4th Cir. 1960), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961); *cf. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). If so, and if that were the only reason for the massive switch from Tire Sales to Berry Tire, then there would be no tie-in. Whether that is the most likely conclusion from the facts before us is irrelevant; it is a disputed issue of fact and therefore a trial must be held. At the trial, the major question will be whether, either because of overt coercion or the power that Cities Service possessed over its dealers resulting from the nature of the petroleum distribution system, the dealers were induced to make TBA purchases for reasons other than those which motivate a reasonable buyer in a free market—namely, price, quality and the like.[8]

▮ Because of the necessity of a trial in this case, we find it advisable to outline what we do not regard as disputed issues of material fact. We think that the undisputed facts show clearly that the last two of the three elements of a *per se* illegal tying arrangement are present. It has been demonstrated beyond dispute that the market-power element is present; the defendant's position in relation to its dealers clearly gives it the power to impose the tie-in on an appreciable number of buyers in the market. Indeed, a year after the defendant allegedly began tying purchases of Berry's TBA to its petroleum sales and service station leases, the plaintiff could find no Citgo dealer who would buy from it. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 503–04, 89 S.Ct. 1252, 1258–59, 22 L.Ed.2d 495, 505–06 (1969); *McMackin v. Schwinn Bicycle Co.,* 354 F.Supp. 1154 (N.D.Ill.1973). The requisite amount of commerce is also indisputably demonstrated. In the Chicago area alone, Cities Service purchased $900,000.00 worth of TBA for eventual resale to its dealers in 1972, one of the years in ques-

---

**6.** Several post-*Texaco* cases, none from this Circuit, have held that the sales-commission plan is not a *per se* violation of the Sherman and Clayton Acts. *Abercrombie v. Lum's, Inc.,* 345 F.Supp. 387, 391–92 n. 10 (S.D.Fla. 1972); *Lee Nat'l Corp. v. Atlantic Richfield Co.,* 308 F.Supp. 1041 (E.D.Pa.1970) (involving same arrangement as *Atlantic Refining*). In *Belliston v. Texaco, Inc.,* 455 F.2d 175 (10th Cir.), *cert. denied,* 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972), the court held that the sales-commission plan was not *per se* illegal and, without explaining its reasons, remanded the case not for a determination under the rule of reason, but rather for judgment for defendant.

**7.** In an attempt to avoid liability, Cities Service has argued this motion as though the case

concerned only a termination of a distributorship contract. If that were truly all that were involved here, there would be no antitrust violation. *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245 (5th Cir. 1975). Cities Service's actions are alleged to have gone beyond mere termination of a contract, however. When Tire Sales remained in the business of distributing TBA, plaintiff contends that Cities Service took actions designed to prevent it from selling to Citgo dealers.

**8.** It would not avail the defendant that some dealers continued to stock a certain amount of competitive TBA; the free market mandated by the Sherman and Clayton Acts is distorted whenever a buyer is induced to buy any amount of a tied good because of a tie-in. *See United States v. Sun Oil Co.,* 176 F.Supp. 715, 719 (E.D.Pa.1959).

tion and the only year for which we have been presented figures. This amount is clearly sufficient. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) ($200,000.00 held to be sufficient); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) ($500,000.00); *Phillips v. Crown Central Petroleum Corp.,* 395 F.Supp. 735 (D.Md.1975) (120,000 gallons of motor oil held sufficient).

We hold one other contention of the defendant irrelevant in this case. The defendant has asserted that it acted in good faith by attempting to obtain a Goodyear or Firestone distributorship for the plaintiff so that it could continue to sell to the Citgo dealers. This would not be a defense. Antitrust liability cannot be avoided by proof that the defendant would have employed the plaintiff in its illegal scheme if only it could have.

## OTHER ALLEGED VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT

The plaintiff has alleged that the same practices which it has asserted constitute a tying arrangement also constitute an illegal group boycott, allocation of territory, exclusive dealing and reciprocal dealing. In our view, the defendant's alleged acts can be most closely characterized as a tying arrangement. *Standard Oil Co. of Cal. and Standard Stations v. United States,* 337 U.S. 293, 305–8, 69 S.Ct. 1051, 1058–59, 93 L.Ed. 1371, 1381–83 (1949); D. I. Baker, *Another Look at Franchise Tie-Ins after Texaco and Fortner,* 14 Antitrust Bull. 767 (1969). Nevertheless, it is often difficult to confine the characterization of an act to a single category. A tie-in, looked at from the point of view of a competitor of the seller is also a group boycott since the purchasers have agreed with the seller not to buy from the competitor. It can be an exclusive dealing arrangement as well if the buyers agree to purchase the tied product from the seller exclusively.

It is, therefore, proper for Tire Sales to proceed to trial on several theories. *Robertson v. National Basketball Association, Inc.,* 389 F.Supp. 867 (S.D.N.Y. 1975) (the same activity characterized as group boycott, horizontal territorial and product allocation, and as analogous to a price-fixing scheme). Since a trial will need to be held on the tying arrangement allegation anyway and since the disputed issues of material fact concerning the tie-in are also involved in the other alleged violations, we deny the cross motions for summary judgment on these other issues.

Our reading of the facts in this case, however, fails to reveal any basis for the allegation of reciprocal dealing, which is an agreement to buy only if the seller in turn agrees to purchase a different product from the buyer. Therefore, we will grant the motion as it relates to this allegation.

## MONOPOLIZATION, ATTEMPT TO MONOPOLIZE AND CONSPIRACY TO MONOPOLIZE

This case illustrates Professor Handler's astute observation that "(m)ost Sherman Act litigation arises under Section 1, with a Section 2 charge thrown in as a mere make-weight." Handler, *Some Misadventures in Antitrust Policymaking—Nineteenth Annual Review,* 76 Yale L.J. 92, 109 (1966) (footnotes omitted). Tire Sales has alleged that the same activity which violates Section 1 of the Sherman Act and Section 3 of the Clayton Act also violates Section 2 of the Sherman Act as monopolization, an attempt to monopolize and a conspiracy to monopolize. We will grant the defendant's motion for summary judgment as it relates to monopolization and attempt to monopolize, but deny both motions as they relate to a conspiracy to monopolize.

In *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786 (1969), the Supreme Court defined monopolization as follows:

The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Thus, to establish a claim of monopolization, the plaintiff must define the relevant market, which is the geographic market "composed of products that have reasonable interchangeability for the purposes for which they are produced— price, use and qualities considered." *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264, 1285 (1956).

■ The plaintiff has asserted that the relevant market is that of wholesale sales of TBA to Citgo dealers. This definition is far too narrow. Although it is conceivable that in certain cases, Section 2 could be violated by monopolizing the distribution of a single product or the purchases of a single buyer, this is not such a case. *See duPont, supra,* 351 U.S. at 393, 76 S.Ct. at 1006, 100 L.Ed. at 1279–80; *Mullis v. ARCO Petroleum Corp.,* 502 F.2d 290 (7th Cir. 1974). It is undisputed here that the TBA sold by Cities Service compete with other TBA on the basis of both price and quality.

It is also undisputed that TBA distributors compete among themselves for the purchases of all service stations and other retail outlets, not just Citgo dealers. The relevant market can be defined no narrower than the wholesale market of TBA on the south side of Chicago. Cities Service comes nowhere near controlling even close to a monopoly share of this market. In *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945), Judge Learned Hand expressed doubt that 64 per cent of the market is a monopoly share and stated that 33 per cent definitely is not. Cities Service controls only a minuscule share of the sales of TBA to service stations.[9]

The plaintiff has tried to circumvent this problem by adding an allegation of attempt to monopolize and asserting that to support such an allegation the relevant market need not be defined. The Ninth Circuit in a series of cases beginning with *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), has developed the rule that, where the defendant has committed a substantial restraint of trade amounting to predatory conduct, the plaintiff can make out a case of attempt to monopolize without demonstrating that the defendant had any power in the relevant market. This rule has had a shaky histo-

---

**9.** We reach this conclusion despite some misleading statistics presented to the Court by Cities Service. In its brief, it asserts, "Exhibit C reveals that Citgo's share of the TBA market in relation to other gasoline outlets has diminished from 5.1 per cent in 1970 to 4.7 per cent in 1974." Exhibit C, however, reveals nothing of the sort. The numbers mentioned actually represent the percentage of Citgo TBA sales to Citgo gasoline sales in the Chicago metropolitan area, not to total service station TBA sales. They were derived by dividing the dollar amounts of Citgo TBA sales in the Chicago area into the dollar amounts of total Citgo gasoline sales in that area. Cities Service also purported to show that its share of the Chicago area gasoline market varied between one and one-and-a-half per cent between 1970 and 1974. A close examination of its statistics, however, reveals that these percentages were derived by dividing Citgo Chicago area sales into the total highway gasoline consumption in *Illinois.*

However, it is clear that defendant's share of the south side TBA market is extremely small and nowhere near the requisite control needed to violate Section 2. In *South End Oil Co. v. Texaco, Inc.,* 237 F.Supp. 650 (N.D.Ill.1965), the court granted defendant's motion for summary judgment on an allegation of both monopolization and attempt to monopolize where the plaintiff's petroleum distributorship had been cancelled. Without citing any market evidence, the court held that the defendant clearly did not have the requisite market control. Similarly, here it cannot justifiably be said that the defendant has the necessary control of the market to support an allegation of monopolization.

ry in the Ninth Circuit [10] and has been widely disapproved by other courts.[11] The rule followed by most courts is that an attempt to monopolize requires the specific intent to obtain monopoly power in the relevant market and a dangerous probability of success. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 550 (1st Cir. 1974). It is settled in this Circuit and others that the definition of the relevant market is an essential element of an action alleging attempt to monopolize. *Mullis v. ARCO Petroleum Corp.,* 502 F.2d 290, 295 (7th Cir. 1974); *Bernard Food Industries, Inc. v. Dietene Co.,* 415 F.2d 1279 (7th Cir. 1969), *cert. denied,* 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970); *Brewer Sewing Supplies Co. v. Fritz Gegauf, Ltd.,* 1970 Trade Cas. Par. 73,139 (N.D. Ill.1970). In *Brewer Sewing Supplies Co. v. Fritz Gegauf, Ltd.,* 1970 Trade Cas. Par. 73,139 (N.D.Ill.1970), the court dismissed a complaint alleging that the defendant had attempted to monopolize the sale of a single product. The ground for dismissal was failure sufficiently to allege a relevant market. In *South End Oil Co. v. Texaco, Inc.,* 237 F.Supp. 650 (N.D.Ill.1965), the court granted summary judgment to the defendant where the plaintiff had alleged that the defendant, by termination of the plaintiff's distributorship, had attempted to monopolize the distribution of its own motor oil. The court held that, in view of the plaintiff's testimony that all motor oils were comparable and competitive, the relevant market could not be so limited. For purposes of this issue, the present case is similar, and we grant the defendant's

motion for summary judgment on the issue of attempt to monopolize.

■ We cannot, however, grant the defendant's motion for summary judgment on the conspiracy-to-monopolize allegation. In *United States v. National City Lines,* 186 F.2d 562 (7th Cir. 1951), *cert. denied,* 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351 the Seventh Circuit held in a case very like the one at bar that the defendants were guilty of a conspiracy to monopolize under Section 2. The defendants, various suppliers, local transportation companies in different cities and a transportation holding company, had been charged with conspiring to monopolize the sale of buses, petroleum products, tires and tubes to the transportation companies by means of reciprocal dealing. Cities Service, charged with conspiring to monopolize the purchases of the Citgo dealers, is in the position of the suppliers in *City Lines.* The decision was concerned with the proper interpretation of Section 2's requirement that the conspiracy be to monopolize "any part" of commerce. The court rejected the defendant's argument that they could not have conspired illegally to monopolize the purchases of a single buyer, or several buyers in several different geographical markets, and held that the requirement concerning "any part" of commerce meant merely that a large volume of commerce be affected. The relevant market was never defined.

We have serious reservations about the *City Lines* holding. The decision is contrary to the thrust of the law as interpreted by other courts, which hold

---

**10.** Recently, the Ninth Circuit reversed a district court's decision that the defendant was guilty of attempting to monopolize on the ground that the court had misdefined the relevant market. The court held that the relevant market was important in determining whether a restraint of trade is substantial enough to rise to a Section 2 violation. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264 (9th Cir. 1975). *See* E. H. Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two,* 72 Mich.L.Rev. 373 (1974).

**11.** *Lessig* was specifically disapproved in *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 550 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237, 1240 (8th Cir. 1973); *Diamond International Corp. v. Walterhoefer,* 289 F.Supp. 550, 575–77 (D.Md.1968); *Becker v. Safelite Glass Corp.,* 244 F.Supp. 625, 637 (D.Kan. 1965); *see also McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332 (4th Cir. 1959).

that the relevant market is an element of a vertical conspiracy as well as other violations of Section 2.[12] *American Football League v. National Football League,* 323 F.2d 124 (4th Cir. 1963); *United States v. Johns-Manville Corp.,* 231 F.Supp. 690 (E.D.Pa.1964). The *City Lines* court principally relied on *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The Supreme Court in that case, however, held not that the relevant market was not important in a conspiracy case, but rather that Section 2 does not require a nationwide monopoly, the words "any part" meaning merely any relevant market which constitutes a part of interstate commerce. Moreover, it is difficult to see why "any part" should be defined differently in a conspiracy case than in a monopolization or attempt-to-monopolize case, where it still requires definition of a relevant market.

Nevertheless, *City Lines* is still the law in this Circuit, and we must deny the defendant's motion regarding the conspiracy allegation.

The plaintiff's motion for summary judgment is also denied for the same reasons that it was denied under Section 1 of the Sherman Act and Section 3 of the Clayton Act.

## THE COUNTERCLAIM

■ Tire Sales and its officers who guaranteed payment do not dispute that they failed to pay the defendant for goods received. The counterdefendants' only defense is that the contract is illegal under the antitrust laws. It is unclear whether the illegality that is the defense was committed before or after the plaintiff's distributorship was terminated, but, in any event, we disagree that this defense is valid. Accordingly, we grant summary judgment for Cities Service on the counterclaim.

The limited use of an antitrust defense to an action on a contract was established in *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). In that case the plaintiff sued the defendant for non-payment for 50 cars of onions, and the defense was that the sale had been made in furtherance of a conspiracy to keep prices high by preventing large amounts of onions from being sold on the futures market. The court rejected this defense and held that a defense of an antitrust violation is limited to situations where the court would be enforcing the precise conduct condemned by the Act:

> Where, as here, a lawful sale for a fair consideration constitutes an intelligible economic transaction in itself, we do not think it inappropriate or violative of the intent of the parties to give it effect even though it furnished the occasion for a restrictive agreement of the sort here in question. (358 U.S. at 521, 79 S.Ct. at 432, 3 L.Ed.2d at 479.)

The plaintiff's remedy for the alleged antitrust violation is limited to the treble damages provided by the Clayton Act. It does not include as well the privilege of not paying for goods received.

■ Because there is no just reason for delay, we will enter judgment for the defendant on the counterclaim under Rule 54(b), Fed.R.Civ.P. In view of the possibility that the counterclaim will be offset by recovery under the plaintiff's complaint, however, we will stay enforcement of this judgment until entry of judgment on the other aspects of this case. *See Emerson Radio & Phonograph Corp. v. Hendrix,* 20 F.R.D. 572 (S.D.N.Y.1957); Moore's Federal Practice, Paragraph 56.17(15).

Accordingly, the defendant's motion is granted insofar as it relates to the allegations of reciprocal dealing, monopolization and attempted monopolization, and judgment is entered in favor of the Cities Service Oil Company and against Tire Sales Corporation, George Nordstrom and Edward Laughlin in the amount of FORTY–TWO THOUSAND

---

**12.** The rule may be different as regards horizontal conspiracies to monopolize. *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir. 1961).

FIVE HUNDRED EIGHTY AND 03/100 DOLLARS ($42,580.03) on the counterclaim. Judgment on the counterclaim is stayed until judgment is entered on the other aspects of this case. In all other respects, the motions of both parties are denied.